**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**KINNEY SHOE CORP., Defendant.**

**Civil Action No. 94–0069–H.**

United States District Court, W.D. Virginia, Harrisonburg Division.

Feb. 14, 1996.

Debra M. Lawrence, Equal Employment
Opportunity Commission, Baltimore District

Office, Baltimore, MD, Gerald S. Kiel, James R. Neely, Jr., Philip B. Sklover, Equal Employment Opportunity Commission, Baltimore, MD, John F. Corcoran, U.S. Attorney's Office, Roanoke, VA, for plaintiff.

Thomas J. Flaherty, Hunton & Williams, McLean, VA, David Alan Walsh, Hunton & Williams, Fairfax, VA, for defendant.

## MEMORANDUM OPINION

MICHAEL, District Judge.

 The court referred this case to the Honorable B. Waugh Crigler, United States Magistrate Judge, pursuant to a standing order, for proposed findings of fact and a recommended disposition. The Magistrate Judge filed a Report and Recommendation on September 19, 1995, recommending that the court grant the defendant's motion for summary judgment and deny the plaintiff's partial motion for summary judgment. The plaintiff filed objections to the Magistrate's Report pursuant to Fed.R.Civ.P. 72(b). In considering the plaintiff's objections, this court is required to undertake a *de novo* review of the record in this case. *Orpiano v. Johnson*, 687 F.2d 44, 47–8 (4th Cir.1982). After review of the record, the court adopts the recommendation of the Magistrate Judge and, accordingly, grants the defendant's motion for summary judgment and denies the plaintiff's partial motion for summary judgment.

### I.

The Equal Employment Opportunity Commission (E.E.O.C.) brings this suit on behalf of Harald Martinson (Martinson)[1], pursuant to Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111 *et seq*, alleging that Kinney Shoe Corp. (Kinney) unlawfully discriminated against Martinson by terminating him as a shoe salesman because he suffers from epilepsy.

1. By leave of the court, Martinson intervened in this case on November 10, 1994.

2. The parties dispute the reason for this termination. Kinney maintains that Martinson was fired in January of 1991 for poor job performance. The E.E.O.C., however, maintains that Martinson was terminated because he allowed customers to seat themselves in the store instead

### A.

Martinson was diagnosed with epilepsy in 1967 at age 17. As a consequence of his disability, Martinson is prone to both generalized tonic-clonic seizures and complex partial seizures. The generalized tonic-clonic seizures affect the entire body and involve the stiffening and jerking of the limbs. *Dreifuss Dep.* at 14–15. The complex partial seizures involve the "impairment of awareness." *Id.* at 15. The seizures result in Martinson becoming unconscious for a brief period of time. Indeed, oftentimes, Martinson will not remember having had a seizure. *Martinson Dep.* at 303–04. If Martinson is standing when a seizure hits, he falls to the ground. *Id.* at 96, 128, 165. Once conscious again, Martinson needs a few minutes to compose himself. *Id.* at 165; *Pealer Dep.* at 155–56. At the onset of a seizure, Martinson relaxes his body, collapses to the floor and remains there until he recovers, appearing to an observer, E.E.O.C. maintains, as if he were sleeping.

### B.

#### 1.

Martinson was first employed by Kinney in its management training program in August, 1989. Employees who successfully complete Kinney's management training program are eligible to become store managers. Martinson participated in the training program for 18 months, earning an "Employee of the Month" award in January, 1990. However, on January 2, 1991, Kinney terminated Martinson.[2] Martinson was subsequently reinstated at Kinney in July, 1991. This reinstatement proved fleeting as Martinson, in late August, 1991, sustained a leg injury that required him to leave work. Martinson then tendered a voluntary resignation in November, 1991.[3] Martinson was again rehired in

of instructing them to sit in the front of the store. This dispute need not be resolved to dispose of the current motions.

3. Martinson contends that he did not actually resign or that his resignation was a mistake. *Martinson Dep.* at 271–73.

January, 1992 by the new District Manager, Allen Bosworth, whose own son had endured a childhood bout with epilepsy, *Bosworth Dep.* At 25–31. The decision to re-hire Martinson was made after Bosworth consulted with Kinney's corporate headquarters in New York. *Bosworth Dep.* at 105–06. Martinson was hired this time as a full-time salesperson, a position that did not previously exist at Kinney. Rather, employees at Kinney worked as part-time salespeople while also participating in the management training program. *Pealer Dep.* at 118; *Bosworth Dep.* at 114–15. Kinney had required employees to participate in the management training program so as to make them "promotable." *Pealer Dep.* at 118. Kinney, however, waived this requirement for Martinson so as to assure that he would remain in the Winchester store as he wished. *Bosworth Dep.* at 114–16. Martinson was again awarded Employee of the Month honors in June 1992. Indeed, the record reflects that Martinson's sales met Kinney's expectations and, in some instances, exceeded them. *Bosworth Dep.* at 219; *Pealer Dep.* at 81, 165.

On July 28, 1992, two days after the ADA was enacted, Martinson was terminated for a second, final time, prompting this action. According to the Separation Report issued upon the second termination, Martinson was fired on account of "seizures in store, sales floor and stock room. Inability to control timing of same." *Plaintiff's Support Memorandum*, exh. 6.

### 2.

Kinney maintains that in the period of Martinson's third stint with the company, that is between January and July, 1992, Martinson experienced 16 seizures while working. E.E.O.C. disputes this figure, noting that Martinson himself recalls enduring only 5 seizures while at work.

The record indicates that Martinson's seizures caused some patrons to leave the store. *Pealer Dep.* at 148–50. Alarmingly, one customer, who felt threatened by Martinson when he was having a seizure, apparently punched Martinson in the face as Martinson was dropping to the ground. *Id.* at 146–47. Martinson's seizures also had implications for store security. For example, Dean Pealer,

the store manager during the relevant time period, testified that he once discovered Martinson in the empty store, lying prone on the sales floor with a charge slip in his hand. *Id.* at 143–45. Moreover the record reveals that employees at the store, by natural reflex, would leave their customers and try to help Martinson to a chair or to the floor if they noticed him in the throes of a seizure. *Pealer Dep.* at 158–63. Co-workers would sometimes ask Martinson's wife, who worked nearby, to attend to him. *Id.* at 164. Martinson's colleagues took these actions even though Martinson informed them of his propensity to succumb to seizures and asked them to leave him alone until he came-to. *Martinson Dep.* at 181–82.

Obviously, Martinson's seizures created the potential for injury. The record shows that during one of his seizures, Martinson fell into a display table on the sales floor, breaking it. *Pealer Dep.* at 156–57; *Martinson Dep.* at 304. On another occasion, Martinson knocked over a polish rack. *Pealer Dep.* at 153–54. And in yet another instance, Mr. Pealer found Martinson lying on the stockroom floor with a lit cigarette on his chest. *Id.* at 150. Indeed, Martinson's own physician, Dr. Dreifuss, concluded that Martinson was at risk for bodily injury any time he had an uncontrolled fall. *Dreifuss Dep.* at 87. Moreover, Dr. Stark, a neurologist, testified that Martinson was in great danger of serious injury given the physical requirements of the position which included climbing ladders. *Stark Dep.* at 75–80. Finally, Kinney's vocational expert, Mr. Shedlin, testified that the workplace could not be made safe for Martinson. *Shedlin Dep.*, exh. 3. Mr. Shedlin noted, however, that Kinney made an effort to remove stock from higher shelves and place it on lower shelves so that Martinson would not have to use the ladder. *Shedlin Dep.*, exh. 3 at p. 2; *Pealer Dep.* at 180–81. It was Mr. Shedlin's view that this accommodation "reduced Mr. Martinson's risk of injury." *Shedlin Dep.*, exh. 3 at p. 2. Mr. Shedlin also testified that Kinney's policy of allowing Martinson to take frequent breaks helped to make Martinson more secure in the workplace. *Id.* The record reflects that although Martinson's seizures are severe, he has never

seriously hurt himself, nor anyone else, as a result of a seizure. *Martinson Dep.* at 329; *Pealer Dep.* at 162. Indeed, the only injury Martinson has ever sustained as a result of a seizure is a "bump or scratch." *Martinson Dep.* at 329.

E.E.O.C. argues that Martinson's second termination in July, 1992 violates the ADA. It seeks various equitable relief as well as compensatory and punitive damages on behalf of Martinson. E.E.O.C. has moved for summary judgment with respect to Kinney's liability. Kinney has also moved for summary judgment.

## II.

### A.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual...." 42 U.S.C. § 12112(a). The statute further defines "qualified individual with a disability" as an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

The Fourth Circuit has developed two alternative schemes for analyzing claims under the ADA, depending upon whether the employer disclaims reliance on the disability in making its adverse employment decision. *Riley v. Weyerhaeuser Paper Co.,* 898 F.Supp. 324, 327 (W.D.N.C.1995); *Vazquez v. Bedsole,* 888 F.Supp. 727, 730 (E.D.N.C. 1995). If the employer does not disclaim reliance on the disability, then a 3–prong test, developed in *Tyndall v. National Education Centers,* 31 F.3d 209 (4th Cir.1994), is utilized. *Riley,* 898 F.Supp. at 327 (employing *Tyndall* scheme). Under this test, a plaintiff must establish that (1) he or she has a disability; (2) he or she is otherwise qualified for the job; and (3) the adverse employment action constitutes unlawful discrimination on the basis of the disability. *Tyndall,* 31 F.3d at 212. However, if the employer does disclaim reliance on the disability, and instead offers other reasons for its adverse action, then the burden-shifting scheme established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) is employed. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55 (4th Cir.1995) (employing *McDonnell Douglas* scheme in ADA case).

It is somewhat contested whether Kinney has disclaimed reliance on Martinson's epilepsy in reaching its termination decision. While Kinney states that "[o]ther business-related factors clearly were the cause of [Martinson's] discharge," *Defendant's Support Memorandum* at 25, the factors that it delineates are all directly related to Martinson's status as an epileptic. Specifically, Kinney argues that it terminated Martinson because of "concerns about injuries, the fact that there was no immediate prospect of eliminating his seizures, and the negative impact his seizures were having on store operations and security." *Id.* Thus, the court must conclude that Kinney did rely on Martinson's epilepsy in making its decision. *See Vazquez,* 888 F.Supp. at 730 ("when the employer relies somewhat upon the employee's disability in discharging the employee, the Tyndall three-prong analysis is applied"); *Teahan v. Metro–North Commuter R.R. Co.,* 951 F.2d 511, 515 (2d Cir.1991), *cert. denied,* 506 U.S. 815, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992) (rejecting argument made under Rehabilitation Act that "termination for *conduct* resulting from a handicap is not termination 'solely by reason of' that handicap") (emphasis in original). The court, therefore, analyzes the current motions for summary judgment in light of the 3–prong test developed in *Tyndall.*

### B.

Summary judgment will be granted if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In considering the current motions for summary judgment, the court will view the evidence and affidavits of the parties in light of the pleadings, drawing all facts and inferences in favor of the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Charbonnages de*

*France v. Smith,* 597 F.2d 406 (4th Cir.1979). A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c).

The non-moving party is entitled to have the credibility of all its evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Before the non-moving party must face the burden of demonstrating the existence of a triable issue of fact, the movant must meet its burden of showing the absence of evidence to support the non-movant's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *see also Cray Communications, Inc. v. Novatel Computer Systems, Inc.,* 33 F.3d 390, 393–394 (4th Cir.1994). There must be more than a "scintilla" of evidence to support the non-movant's case. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Rather, the evidence must be sufficient to "return a verdict" at trial for the party opposing the entry of judgment. *Id.*

## C.

### 1.

Under *Tyndall's* three-prong test, E.E.O.C. must first establish that Martinson is an individual with a disability. The ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). Although Kinney does not concede that Martinson's epilepsy renders him disabled under the ADA, the court concludes, at least for the purpose of resolving the current motions for summary judgment, that Martinson is disabled under the terms of the statute. Indeed, the undisputed evidence shows that Martinson is prone to tonic-clonic seizures that temporarily render him unconscious.

Such a condition obviously limits Martinson in significant ways. Moreover, "[f]ederal regulations support the conclusion that epilepsy should normally be considered an impairment under the ADA." *Eckles v. Consolidated Rail Corp.,* 890 F.Supp. 1391, 1398 (S.D.Ind.1995) (citing 29 C.F.R. Pt. 1630 App. and 29 C.F.R. § 1615.103); *see also Vazquez,* 888 F.Supp. at 731 (assuming for purposes of summary judgment that epilepsy is a disability under the ADA); *Susie v. Apple Tree Preschool & Child Care Ctr., Inc.,* 866 F.Supp. 390 (N.D.Iowa 1994) (same); *Reynolds v. Brock,* 815 F.2d 571, 573 (9th Cir.1987) (epilepsy is handicap under Rehabilitation Act, citing cases). Thus, the court assumes that E.E.O.C. has met its burden with respect to the first prong of the *Tyndall* analysis.

### 2.

E.E.O.C. must next establish that Martinson is qualified for his position as shoe salesman despite his disability. In deciding whether Martinson is otherwise qualified to be a shoe salesman, the fact-finder must determine "whether [Martinson] could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue." *Tyndall,* 31 F.3d at 213 (4th Cir.1994).[4] However, "an individual is not otherwise qualified if he poses a significant risk to the health or safety of others by virtue of the disability that cannot be eliminated by reasonable accommodation." *Doe v. Univ. Of Maryland Medical Sys. Corp.,* 50 F.3d 1261, 1265 (4th Cir. 1995). Similarly, if an employee poses a danger to himself, he is not deemed to be "otherwise qualified." 29 C.F.R. § 1630.2(r) App.

Kinney argues that Martinson was not otherwise qualified for his position as shoe salesperson because (1) his disability prevented him from carrying-out the essential functions of his position and (2) because he was a danger to himself and to others. The court

---

**4.** In the event that the employee cannot perform the essential functions of the job, the factfinder must then determine whether any reasonable accommodation by the employer would enable the employee to perform those functions. *Tyndall,* 31 F.3d at 213. The issue of reasonable accommodation is not before the court since E.E.O.C. concedes that no accommodations were necessary for Martinson to perform his job. *Plaintiff's Support Memorandum* at 14.

addresses these two arguments separately below.

a.

In defining the "essential functions" of a job, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. 12111(8). Kinney's "Position Description" defines the essential functions of a full-time shoe salesman as including, *inter alia*, retrieving and replacing merchandise from stockroom shelves, unloading shipments of stock, and maintaining store appearance. *Pealer Dep.*, exh. 1. These activities, in turn, dictate certain physical requirements, including the ability to climb a ladder, climb stairs, stoop, kneel, pull, reach and lift weights of between 5 and 25 pounds. *Id.* Moreover, salespeople are expected to be able to stand for approximately 7 to 12 hours per day, 5 to 6 days per week. *Id.* Kinney also maintains that an essential function of a salesperson is to "help on security, keep eyes out" to protect against theft. *Pealer Dep.* at 49. Although this requirement is not listed in the company's "Position Description," the court concludes that it is an inherent part of a shoe salesperson's job given that Kinney does not hire security guards. *Id.* at 53.

Kinney makes the self-evident observation that Martinson was unable to fulfill these essential responsibilities "while he was lying unconscious, taking a break to regain his composure, or [was] otherwise incapacitated." *Defendant's Opposition Memorandum* at 18.

Kinney cites *Gault v. University of Chicago Hospitals*, 1991 WL 38757 (N.D.Ill., March 19, 1991) an unpublished, district court opinion, for the proposition that susceptibility to incapacitating epileptic seizures can render a person unqualified for a position, as a matter of law, because an individual subject to such seizures cannot fulfill his or her duties while unconscious. In *Gault*, a nurse employed in the burn unit suffered from a form of epilepsy, similar to Martinson's, that caused her to lose consciousness during sei-

zures. Indeed, on two occasions, the nurse lost consciousness while cutting patients' bandages. *Id.* at *1. The court in *Gault* held that "[i]n these circumstances, Gault cannot contend that she was meeting her position requirements." *Id.*

Kinney also cites *Johnston v. Morrison, Inc.*, 849 F.Supp. 777 (N.D.Ala.1994) in arguing that Martinson's seizures rendered him unqualified, as a matter of law, to be a shoe salesman. In *Johnston*, a waitress suffered panic attacks whenever the restaurant became crowded or the owner changed the pricing structure of the menu. The court in *Johnston* concluded that plaintiff's "meltdowns" rendered her unqualified for her position because "Ms. Johnston's position as a food server required her to perform duties during all times she was at her work station, whether the situation presented slow or busy periods." *Id.* at 780.

Thus, Kinney argues that *Gault* and *Johnston* support its proposition that Martinson was unqualified as a matter of law to be a shoe salesperson because he could not discharge his duties at all times. The court concludes, however, that Kinney's reliance on *Gault* and *Johnston* is misplaced. With respect to *Gault*, the court believes that the holding of that case is appropriately limited to its facts. The court reaches this conclusion by observing that a nurse is charged with caring for patients, a task which if compromised, can leave other individuals in difficult straits. A shoe salesman, in contrast, is charged with selling shoes, a task which if compromised, simply leaves customers without shoes for a brief period. Thus, the failure on the part of a shoe salesman effectively to carry-out his responsibilities does not implicate greater issues of public policy. Accordingly, the court concludes that the facts of *Gault* are in some sense, *sui generis*.

With respect to *Johnston*, the court notes that in that case, plaintiff's adverse physical reaction was *caused* by aspects of the work environment that could not be altered through reasonable accommodation. Given this set of circumstances, the court's holding is unremarkable. Indeed, it is analogous, for example, to a holding that those who are allergic to cats are unqualified to

be cat groomers. In contrast, Kinney does not argue here that unalterable attributes of Martinson's work environment caused his seizures which, in turn, rendered him unqualified for his position. Rather, it is undisputed that there is nothing inherent in the position of a shoe salesperson that causes Martinson to suffer seizures—the seizures appear to occur mostly at random. Thus, the court concludes that *Johnston* is distinguishable.

More importantly, however, the court is troubled by the consequences of Kinney's argument that, because Martinson suffers temporarily-debilitating epileptic seizures, he is, as a matter of law, unqualified to be a shoe salesperson since he obviously cannot perform the essential functions of the job while temporarily incapacitated. The court believes that this argument sweeps too broadly. Indeed, the natural consequence of the argument is that Martinson is unqualified as a matter of law to hold *any* position because Martinson obviously cannot discharge the "essential functions" of any job during the time he is unconscious. But this reality cannot serve to bar Martinson from gainful employment. Indeed, the ADA requires employers reasonably to accommodate an employee's disability. Thus, if it is reasonable, for example, to allow an employee to take breaks during brief periods of incapacitation, then an employer must do so. *See, e.g., Overton v. Reilly,* 977 F.2d 1190, 1195 (7th Cir.1992) (reversing grant of summary judgment to employer where employee took naps during work because "if [plaintiff]'s sleepiness is a function of his disability (or, more properly, of the treatment for his disability) and he can still perform the essential functions of his job, then he may still be viewed as "qualified" under the Rehabilitation Act"). The court, therefore, concludes that the fact-finder must examine the specific facts of each case to determine if temporary incapacitation renders an individual unqualified for the position at issue.

Not to be deterred, Kinney contends that, in any event, Martinson's seizures rendered him unqualified for the position because the seizures disrupted store operations, compromised store security by forcing other employees to drop their responsibilities to attend to him, and adversely impacted customer relations.[5]

E.E.O.C., in contrast, argues that Martinson's seizures did not render him unqualified for his position as shoe salesman. Martinson's supervisor, Mr. Pealer, testified that during the times when Mr. Martinson was not having a seizure, the overwhelming majority of the time, he was a reliable employee who was able to discharge all the duties associated with his position. *Pealer Dep.* at 84. In fact, Martinson's sales figures consistently met Kinney's expectations, and in some cases, exceeded them. Moreover, the record reflects that Martinson was awarded the Employee of the Month award for January, 1990 and June, 1992. With respect to

---

**5.** The court does not consider customers' adverse responses to Martinson's seizures as particularly relevant to the analysis of this case given evidence in the record that Kinney itself did not consider the effects Martinson's seizures had on patrons to be of significant concern. The court notes the following colloquy in Allen Bosworth's deposition:

Q: Do you know if customers were being frightened away as a result of his seizures?

A: I ... we took no poll, I do not know off hand.

Q: Did you have a concern that that was going to happen?

A: There was ... there was no concern at the time.

Q: There was no concern anytime between January and July of '92 about you losing customers?

A: Through that time we were looking at an abundance of reasons as to why Kinney was losing customers, and this was just ... this was insignificant, this part of the Winchester operation, but it was ...

Q: When you say, what was part of the Winchester operation?

A: This situation that we had here.

Q: Marty's seizures?

A: Right. But it was not, it was not a primary concern that Marty was scaring customers directly out of the store.

*Bosworth Dep.* at 184–85. *But see Pealer Dep.* at 149–150 (expressing concern about impact seizures were having on customers). Moreover, Kinney's argument that Martinson's seizures adversely impacted customer relations resembles the argument made by those who did not wish to hire African–Americans that their businesses would be hurt if they engaged in such hiring practices. Obviously, this is precisely the form of discrimination statutes like the ADA were designed to eliminate.

the seizures themselves, E.E.O.C. insists that they are not inherently disruptive. Indeed, the record indicates that all Martinson requires to recover from a seizure is to be left alone.

Based upon this conflicting record, the court concludes that a genuine issue of material fact exists with respect to whether Martinson was qualified to perform the essential functions of a shoe salesperson despite his seizures. It is clear that Martinson was able to sell shoes as well as anyone else employed by Kinney. Moreover, it is undisputed that Martinson could adequately perform the essential functions of his job, as those functions were designated by Kinney, while he was seizure-free. However, it is also clear from the record that Martinson's seizures were disruptive of Kinney's operations. This court must assume that if an employee causes vast disruption at the workplace, and if no possibility exists of cabining that disruption, then the employee is unqualified for the position. However, the degree of disruption caused by the employee's disability must be substantial in order to render an employee unqualified. Otherwise, as noted above, the court would be validating the position that persons susceptible to debilitating epileptic seizures are, as a matter of law, unqualified to hold any job since such seizures will cause *some* disruption in most, if not all, work environments. In short, whether the seizures in this particular case were disruptive enough to render Martinson unqualified must be determined by reference to the frequency and effects of the seizures. Since these two issues remain in dispute, summary judgment for Kinney is inappropriate on this ground. *See U.S. E.E.O.C. v. AIC Sec. Investigation Ltd.*, 820 F.Supp. 1060 (N.D.Ill.1993) (denying employer's motion for summary judgment on the grounds that there was a genuine issue of material fact as to whether the employee, who was suffering from cancer and, therefore, missed a great deal of work, was "qualified" for the position of Chief Executive of the security guard division of the company).

b.

Nevertheless, summary judgment for Kinney is appropriate if no genuine issue of material fact exists to the effect that Martinson posed "a direct threat to the health or safety of other individuals in the workplace," 42 U.S.C. § 12113(b), or that he posed a risk to himself. 29 C.F.R. § 1630.2(r). In this way, Kinney may be able to show that Martinson is unqualified as a matter of law. *Doe v. Univ. Of Maryland Medical Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir.1995).

The ADA defines "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). Moreover,

> The determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job.... In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
>
> (2) The nature and severity of the potential harm;
>
> (3) The likelihood that the potential harm will occur; and
>
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r). Finally, "[t]he risk can only be considered when it poses a significant risk i.e. high probability of substantial harm; a speculative or remote risk is insufficient." 29 C.F.R. § 1630.2(r) App.

Both parties argue that there is no genuine issue of material fact as to whether Martinson posed a direct threat to himself or to others while at work—Kinney argues that Martinson's seizures posed a direct threat while E.E.O.C. contends that they did not. Kinney cites the medical testimony of Dr. Dreifuss and Dr. Stark to the effect that Martinson was at risk for bodily injury any time he had an uncontrolled fall and that falling from a ladder was an inherent risk in Kinney's work environment. Kinney also cites Mr. Shedlin's testimony that the workplace could not be made safe for Martinson. In short, Kinney argues that, in accordance with E.E.O.C.'s requirements, it made an

"individualized assessment" of Martinson's condition and determined that Martinson presented a direct safety threat, thereby rendering him unqualified to be a shoe salesperson as a matter of law.

In contrast, E.E.O.C. argues that it is clear from the record that Martinson did not pose a direct threat of injury to himself or to anyone else. Specifically, E.E.O.C. maintains that the fact that Martinson has never injured himself nor others since he was diagnosed with epilepsy makes the threat of any future injury so remote that it hardly can be considered a direct threat. Moreover, E.E.O.C. observes that Martinson does not pose a threat to anyone, including himself, when he is lying prostrate on the floor, recovering from a seizure.

■ Although the court is concerned that Martinson could injure himself, or perhaps others, upon falling during the onset of a seizure, the court concludes that this potential harm does not pose a "direct threat" to the physical well-being of Martinson or others. In analyzing the four factors delineated under E.E.O.C. regulations, the court first concludes that the duration of the risk is fleeting. Indeed, the risk of injury stems from a split-second event—Martinson's falling to the floor. Second, the nature and severity of the potential harm is not overwhelming. Little harm can come to others from Martinson's seizures. The only threat to others is that Martinson will fall into them on his way to the floor. The severity of such harm strikes the court as *de minimis*. With respect to Martinson himself, the court concedes that Martinson could harm himself significantly if, for example, he were to fall to the floor from the top of a ladder while retrieving stock. Kinney concedes, however, that it took steps to eliminate this possibility by removing stock from higher shelves and placing it on lower shelves so that Martinson would not have to use the ladder. Thus, the court concludes that this accommodation significantly reduced the severity and risk of potential harm to Martinson stemming from his seizures. Indeed, such was the testimony of Kinney's vocational expert. Third, the court finds that the likelihood that the potential harm will occur is relatively minor given the complete absence of any history of Martinson injuring himself during his seizures. Indeed, the worst injury to befall Martinson as a result of a seizure is a "bump or scratch." And finally, in light of this last observation, the court concludes that the potential for substantial harm is not imminent.

Thus, the court finds that Martinson's seizures do not pose "a direct threat to the health or safety of other individuals in the workplace," 42 U.S.C. § 12113(b), nor do they pose a direct threat to the safety of Martinson himself, 29 C.F.R. § 1630.2(r). The potential risk of injury, in the record before the court, simply cannot be characterized as a "high probability of substantial harm." 29 C.F.R. § 1630.2(r) App. And given the court's previous finding that a genuine issue of material fact exists as to whether Martinson could perform the essential functions of a shoe salesperson, summary judgment for Kinney is inappropriate on the grounds that Martinson is not "otherwise qualified."

### 3.

### a.

■ Summary Judgment for Kinney is still warranted if it is clear from the record that Kinney did not unlawfully discriminate against Martinson. To assess this issue, it is first necessary to define "unlawful discrimination." The term inherently recognizes that not all forms of discrimination are prohibited by the ADA. On the one hand, the purpose of the ADA, like that of similar statutes such as the Rehabilitation Act, is "to ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others." *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 284, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987). On the other hand, however, the court must recognize that "[a]lthough the Act forbids discrimination based on stereotypes, an employer is entitled to make employment decisions based on the actual attributes of the handicap." *Teahan v. Metro–North Commuter R.R. Co.*, 951

F.2d 511 (2d Cir.1991), *cert. denied,* 506 U.S. 815, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992).[6]

In *Tyndall,* the Fourth Circuit appeared to define "unlawful discrimination" under the ADA as discrimination based solely upon harmful assumptions divorced from fact. This interpretation of what constitutes "unlawful discrimination" recognizes that employers are allowed to consider an employee's specific disability in making personnel decisions.

The plaintiff in *Tyndall* alleged she was fired, in part, because of illegal discrimination on the basis of her missing substantial amount of work to care for her disabled child. The court rejected her third-prong argument stating that the person who fired her

> did not make an unfounded assumption that [plaintiff] would have to miss work to take care of [her son]. Rather [her supervisor] responded to [plaintiff]'s record of extended business absences in connection with [her son]'s care and her actual statement that she would, in fact, have to miss additional work in order to be with her son.
>
> \* \* \* \* \* \*
>
> Because [plaintiff]'s termination was not based on any assumption regarding future absences related to [her son]'s care, but instead resulted from her record of past absences and her clear indication that she needed additional time off, we hold that [employer]'s actions did not constitute discrimination based on [plaintiff]'s association with a disabled individual.

*Id.* at 214.

In short, the discussion of "unlawful discrimination" in *Tyndall* suggests that the ADA prohibits an employer from taking adverse action against a disabled person simply on the basis of the person's status as disabled, without regard to the person's employ-ment record or other qualifications. *See Champ v. Baltimore County,* 884 F.Supp. 991, 996 (D.Md.1995) ("A blanket exclusion of all disabled police officers clearly constitutes unlawful discrimination on the basis of a disability because it is based on generalizations or stereotypes about the effects of a particular disability on an individual"). However, if the employer acts on account of a record of harmful behavior that is directly attributable to the disability, "unlawful discrimination" is not present. In addition, the court held in *Tyndall* that a "strong inference of nondiscrimination [exists] when the hirer and firer are the same person." *Tyndall,* 31 F.3d at 215.

#### b.

The question presented under the third prong of the *Tyndall* analysis is whether Kinney unlawfully discriminated against Martinson by terminating his employment. Specifically, the court must determine whether Kinney's decision to terminate Martinson, based as it was upon Martinson's "seizures in store, sales floor and stockroom" and his "[i]nability to control timing of same," *Plaintiff's Support Memorandum,* exh. 6, constitutes "unlawful discrimination."

The court concludes that it does not. E.E.O.C. cannot show that Martinson's termination was an outgrowth of generalized assumptions about epileptics. The record clearly indicates that Kinney did not fire Martinson because it stereotypically assumed that epileptics are a danger to themselves and others and because their seizures create security problems. Rather, Kinney took the action it did because it had first-hand experience with Martinson's seizures, and their effects, and because it made an individualized determination that Martinson's seizures undermined the proper functioning of the store. That is, Kinney fired Martinson because of the specific attributes of his specific form of

---

**6.** The court notes that *Arline* and *Teahan* are decisions under the Rehabilitation Act, not under the ADA. However, the ADA was patterned after the Rehabilitation Act and has been interpreted in light of that statute. *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 57 (4th Cir.1995) ("To the extent possible, we adjudicate ADA claims in a manner consistent with deci-sions interpreting the Rehabilitation Act"); *Tyndall,* 31 F.3d at 213 n. 1 (noting that "the ADA expressly requires its provisions to be interpreted in a way that 'prevents imposition of inconsistent or conflicting standards for the same requirements' under the two statutes, 42 U.S.C. § 12117(b), ...").

the disability, not simply because he had the general disability. This would be an entirely different case if Kinney fired a salesperson, or failed to hire a salesperson, simply because of his or her status as an epileptic without considering the scope and effect, if any, of the individual's seizures.

E.E.O.C. does not allege that Kinney fired Martinson on account of invidious stereotyping. Rather, it maintains that Martinson was fired because of his seizures, but it does not address whether that justification constitutes *unlawful* discrimination. E.E.O.C. simply assumes that it does and thereby fails to recognize that the ADA countenances, in many instances, adverse employment action taken by employers on the basis of an employee's disability and not on the basis of harmful stereotypes. *See Vande Zande v. State of Wisconsin Dept. Of Admin.*, 44 F.3d 538 (7th Cir.1995) ("In the common case in which ... an impairment interferes with the individual's ability to perform up to the standards of the workplace, or increases the cost of employing him, hiring and firing decisions based on the impairment are not 'discriminatory' in a sense closely analogous to employment discrimination on racial grounds").

E.E.O.C. does argue that the court reads *Tyndall* too narrowly. It contends that the Fourth Circuit, in reaching its decision in that case, held that the plaintiff's numerous absences rendered her unqualified for her position. Thus, E.E.O.C. argues that the plaintiff in *Tyndall* could not state a claim under the ADA because she could not carry her burden under the second prong of the analysis. However, the court in *Tyndall* explicitly discussed the "unlawful discrimination" prong. In addressing this third prong, the court did not rely on the fact that the attribute of the disability made the plaintiff unqualified. Indeed, the court stated that "[e]ven if Tyndall were a "qualified" employee covered by the ADA, she nonetheless could not recover under the Act because she has failed to show that [the employer] in any way discriminated against her." *Tyndall*, 31 F.3d at 214. Specifically, as noted above, the court held that the termination decision was lawful because it was "not based on any

assumption regarding future absences .... but instead resulted from [plaintiff's] record of past absences and her clear indication that she needed additional time off." *Tyndall*, 31 F.3d at 214. Thus, the court conceded, for purposes of the third-prong analysis, that plaintiff's absences did not render her unqualified for her position. Still, the court found, plaintiff could not carry her burden under the third prong because the termination decision was not based on ("an unfounded assumption that [plaintiff] would have to miss work to take care of [her son]"). *Id.*

Similarly here, even if Martinson's seizures did not render him unqualified for his position as shoe salesman, it is undisputed that Kinney terminated his employment due to specific concerns stemming from specific characteristics of Martinson's disability that, it is conceded, would continue indefinitely, and not because Kinney harbored some unfounded and irrational assumption about Martinson's disability. Such conduct on the part of Kinney does not constitute unlawful discrimination. *Cf. Anderson v. University of Wisconsin*, 841 F.2d 737, 741 (7th Cir.1988) ("the Rehabilitation Act requires only a stereotype-free assessment of the person's abilities and prospects rather than a correct decision").

Moreover, the court finds that there is little evidence of discriminatory intent on the part of Kinney. Indeed, the record reflects the opposite. First, Kinney is afforded a strong inference of nondiscrimination on its part since the same person, Allen Bosworth, hired and fired Martinson. *Tyndall*, 31 F.3d at 214–15. Although E.E.O.C. maintains that Mr. Bosworth was not intimately involved in the decision to re-hire Martinson in January 1992, the record indicates that Mr. Bosworth did indeed play an important role in the decision to re-hire Martinson. Second, the court notes that Mr. Bosworth's son had a childhood bout with epilepsy. This is a significant fact, the court believes, because it undermines E.E.O.C.'s contention that Mr. Bosworth harbored discriminatory animus towards individuals with epilepsy. Third, it is undisputed that Martinson suffered at least five seizures while at work between

**432**

January and July, 1992. The fact that Kinney did not take action for six months despite the occurrence of several seizures, belies the assertion that Kinney acted with discriminatory intent in terminating Martinson. Fourth, it is undisputed that Kinney created a new position for Martinson—that of full-time salesperson—upon his return to Kinney in January 1992. Kinney did this with full knowledge that Martinson was susceptible to seizures at work. Fifth, the record shows that Kinney took other proactive steps to ensure Martinson's continued employment. For example, stock was reshelved to limit Martinson's use of ladders. Martinson was also allowed to take numerous breaks. Finally, Kinney re-hired Martinson on two separate occasions.

For all these reasons, the court concludes that Kinney, as a matter of law, did not unlawfully discriminate against Martinson in terminating his employment. Accordingly, E.E.O.C. cannot carry its burden on the third prong of the *Tyndall* analysis and summary judgment for Kinney is appropriate.

### III.

The court finds that no genuine issue of material fact exists as to whether Kinney unlawfully discriminated against Martinson. The record overwhelmingly indicates that Kinney did not harbor invidious assumptions about the abilities of individuals with epilepsy in making its decision to terminate Martinson. Thus, the court grants Kinney's motion for summary judgment and denies E.E.O.C.'s partial motion for summary judgment.

An appropriate Order will this day issue.