Abraha B. KALEKIRISTOS, Plaintiff,

v.

CTS HOTEL MANAGEMENT CORPO-
RATION t/a Renaissance Mayflow-
er Hotel, Defendant.

Civ. A. No. 96–1854 (CRR/PJA).

United States District Court,
District of Columbia.

March 18, 1997.

William Payne, Washington DC, for Plaintiff.

James Melvin Mesnard, Washington DC, for Defendant.

## MEMORANDUM OPINION

ATTRIDGE, United States Magistrate Judge.

The defendant, the CTF Hotel Management Corporation, t/a the Renaissance Mayflower Hotel (CTF) has moved for summary judgment pursuant to rule 56(c) of the Federal Rules of Civil Procedure, on the grounds that the plaintiff's, Abraha B. Kalekiristos', evidence following the conclusion of discovery is insufficient to prove the essential elements of either of his causes of action: (1) disability-based discrimination under Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* or (2) race- and national origin-based discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

Pursuant to 28 U.S.C. § 636(C), the parties consented to proceed before a U.S. Magistrate Judge for all purposes, including the entry of final judgment. On January 29, 1997, this Court issued an order entering summary judgment in favor of defendant CTF Hotel Management Corporation against the plaintiff. [# 29]. Following is the memorandum opinion setting forth the Court's reasons.

### I. Summary Judgment Standard

Summary judgment is appropriate "where there is no genuine issue as to any material fact." FED. R. CIV. P. 56(c). "Rule 56(c) mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In such case, the moving party is entitled to summary judgment as a matter of law. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510.

A material dispute of fact "is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth", *Hirschhorn v. Sizzler Restaurants Int'l. Inc.,* 913 F.Supp. 1393, 1397 (D.Nev.1995); "[a] dispute of fact 'is *genuine* ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ' *Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092, 1099 (S.D.Ga.1995)(quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510). "A mere 'scintilla' of evidence does not suffice to support the nonmovant's position." *Haysman,* 893 F.Supp. at 1099. If the moving party makes a sufficient showing pursuant to Rule 56(c), then the nonmoving party must come forward with affidavits and/or other evidence as provided by Rule 56(e), setting forth specific facts showing that there is a genuine issue for trial; the party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

Viewing all facts and inferences in a light most favorable to the non-moving party, *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994) (citing *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511), if that party, as in the instant action, responds only with conclusory allegations and fails to advance sufficient Rule 56 evidence on the issues of the case for which it has the burden of proof at trial, the party cannot overcome a summary judgment against it. *Haysman,* 893 F.Supp. at 1099. "After drawing inferences favorable to the [nonmovant], summary judgment will be granted only if all reasonable inferences defeat the [nonmovant's] claims." *Hirschhorn,* 913 F.Supp. at 1397. Courts do not weigh conflicting evidence or make credibility determinations; only where the nonmovant's evidence is insufficient to allow a reasonable jury to return a verdict in its favor as a matter of law, or is merely colorable or not significantly probative, then the movant is entitled to summary judgment. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11. " [E]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." ' *Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d 86, 95 (1st Cir.1996)(quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990), quoted in *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993)).

Summary judgment is granted in employment discrimination cases only when the plaintiff cannot establish a material factual dispute on each element of the prima facie case. *Weber v. American Express Co.,* 994 F.2d 513, 515–16 (8th Cir.1993). Courts exercise special caution when considering whether to grant summary judgment in employment discrimination cases when the employer's intent is at issue, *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994); however, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 40 (2d Cir.1994). For any nonmovant, including a discrimination plaintiff, to survive a motion for summary judgment, he or she must do more than present conclusory allegations of discrimination; "concrete particulars" must be presented to substantiate the discrimination claim. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88

L.Ed.2d 74 (1985)("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.")

The Court has examined Mr. Kalekiristos' amended complaint and his opposition to the summary judgment motion according to the preceding considerations and finds that the plaintiff failed to establish a genuine issue of any material facts for which he bears the burden at trial, thus summary judgment in favor of the defendant is appropriate as a matter of law.

## II. Background

The following are undisputed material facts as well as undisputed and disputed—as noted—immaterial facts as provided by the parties in the summary judgment motion, opposition and the entire record:

Abraha B. Kalekiristos, a naturalized U.S. citizen as of April 1996, is a black male of Ethiopian descent; he lived in Sudan for about six years before emigrating to the United States on January 25, 1990. He settled in Washington, D.C. on January 26, 1990, and he was hired by the defendant on March 9, 1990, as an employ at will,[1] where he remained gainfully employed until terminated on March 24, 1994.[2]

---

1. The plaintiff suggests in his amended complaint that "[o]n March 14, 1994, [he] received a written promise from defendant's general manager that he would be offered continued employment with the Mayflower." [Pl's amend. compl., § VIII, ¶ 5] To the extent that the plaintiff is suggesting he had a contractual employment relationship with the defendant, the Court refers the plaintiff to the District of Columbia's employment at-will doctrine, pursuant to which an employee "may be terminated for any reason or no reason at the will of either party in the absence of an express or implied contract concerning the duration of employment." *Domen v. National Rehabilitation Hosp., Inc.*, 925 F.Supp. 830, 834 (D.D.C.1996). The letter to which the plaintiff is referring clearly is not an employment contract, and the plaintiff has not attempted demonstrate an intent on the part of either party to enter into such an employment contract. [*See* Biggar 3/14 letter, pl's opp., exh. 4]. Further, had the plaintiff demonstrated such intent on the part of the defendant, the plaintiff has failed to show he accepted such an offer as he has made no mention of his scheduled 1:20 pm meeting on March 16, to discuss with the Human Resources Depart-

Kalekiristos worked with two other laundry attendants on the 7:00 am to 3:00 pm shift. They were jointly responsible for sorting laundry, loading and unloading washers and dryers, and stocking linen closets on the nine guest floors. [Def's pts & auth. at 2; pl's dep., 18:3 –19:13].[3] It appears Kalekiristos also worked, at least during July 1992, the 10:00 am to 7:00 pm shift [*see* def's mot., exh. 2 to exh. C], and a shift that began at 8:30 am in March of 1992. [*See* def's mot., exh. 1 to exh. C].

On March 14, 1992, Kalekiristos was given a written warning for calling in 45 minutes late on a day his shift started at 8:30 am. [*Id.*]. He disputes that he was being reprimanded for calling in sick and asserts instead that he arrived late, at 9:15 am, on March 13. [Pl's opp. at 4; pl's dep., 178:22–182:4]. Nevertheless, the parties agree that a written warning was issued to him by Ms. Louise Ellis, one of the plaintiff's supervisors, for not reporting before 9:15 am. [*Id.*]. Ms. Ellis is African American. [Def's pts & auth. at 2; pl's dep., 182:5–6]. Although the reprimand acknowledged in writing by Kalekiristos states he previously received a verbal warning about calling in after his shift had begun, he now denies that he ever received such a warning. [Pl's dep., 181:14–21]. These disputes are immaterial as the reprimand oc-

---

ment available positions, which was also the subject of the so-called written promise of continued employment. [*See id.*]. Finally, also on March 14, 1994, the plaintiff was advised by Ms. Margaret Swim, Human Resources Benefits Manager, that "[i]f he continues to refuse to follow his supervisors [sic] directions there will be further disciplinary action taken, this could be termination." [Def's mot., exh. 9 to exh. C].

2. The plaintiff's amended complaint states he was terminated May 24, 1994. [*See* pl's amend. compl., § VIII, ¶ 6]; the Court presumes this is a typographical error.

3. The plaintiff has been deposed twice. The first time was in February 1995, in response to his workers' compensation claim, and the second was in October and November 1996, regarding the instant civil suit. With corresponding pages and lines noted, the plaintiff's statements from these depositions are identified as "Pl's workers' comp. dep." and "Pl's dep.", respectively. At both depositions, the plaintiff had the aid of an interpreter.

curred almost two years prior to the alleged discrimination period.

On July 6, 1992,[4] Kalekiristos again was counseled by Ms. Ellis—this time for failing to clear the laundry chutes at the end of his shift.[5] [Def's mot., exh. 2 to exh. C]. Also in attendance during this counseling session were Ms. Margie Maye and Ms. Margaret Swim. [Id.]. Ms. Swim, the Human Resources Department Benefits Manager, is white [def's pts & auth. at 3; pl's dep. 180:9]; Ms. Maye is the plaintiff's union shop steward and is African–American. [Def's pts & auth. at 3; pl's dep., 185:4–5].

Just over a year later, August 29, 1993, while Kalekiristos was loading towels into a washing machine he experienced back pain and fell to the floor. [Pl's dep. 20:10 –22:9]. He was taken by ambulance to George Washington University Medical Center Emergency Room and released the same day with a physician's note stating he should not lift anything weighing more than 15 pounds. [Pl's dep., 22:10—23:1]. On return to work the following day, Kalekiristos delivered the physician's restrictions to Mr. Alan Schaefer, who informed him there was no light work available. [Pl's dep., 23:2–7].

Shortly thereafter, Kalekiristos was referred by his former attorney to Dr. Jeffrey Phillips, an orthopedic surgeon, for medical evaluation. [Pl's dep., 23:8–24:6]. Dr. Phillips placed the plaintiff on sick leave on September 3, 1993, retroactive to the date of injury—August 29, 1993. [Def's mot., exh. 3 to exh. C]. He also instituted a program of twice a week physical therapy consisting of heat, electrical stimulation and massage [Cohen rpt., def's mot., exh. D]; no medications were prescribed. [Id.]. Dr. Phillips' physical therapy program ended on November 1, 1993. [See Kurzrok rpt., def's mot., exh. F].

On October 6, 1993, Kalekiristos was referred by his former attorney for a medical evaluation by Dr. John B. Cohen, also a board certified orthopedic surgeon. [Cohen rpt., def's mot., exh. D]. Dr. Cohen found the x-ray films of the cervical spine and lumbar spine to be "unremarkable." [Id.]. And, despite the plaintiff's physical complaints of chronic pain, Dr. Cohen concluded that "[t]he patient's subjective complaints of pain are not correlated by his objective findings." [Id.]. Dr. Cohen further noted:

> [The plaintiff] is now six weeks post-injury. He has no definite neurological deficit ... his range of motion of his lumbar spine was fair ... if necessary, an MRI scan should be obtained to rule out any significant interdiskal pathology but I believe I need to review the records of his treating physician first, prior to making the determination. My overall impression is that this gentleman's complains [sic] of pain are not substantiated by [Dr. Cohen's] objective findings.

[Id.]. MRIs of the neck and low back were ordered later in October. [Kurzrok rpt., def's mot., exh. F].

On November 11, 1993, while Kalekiristos was on leave from his work-related injury, he was involved in a motor vehicle accident [pl's dep., 25:22–26:3], and taken by ambulance to the Washington Hospital Center, where x-rays of the chest and neck were "reportedly ok." [Kurzrok rpt., def's mot., exh. F]. After receiving an injection and a prescription for Motrin for pain, he was released. [Id.]. A neck injury purportedly caused by the motor vehicle accident was treated by Dr. David Ellis, a chiropractor, beginning November 18, 1993. [Ellis rpt., def's mot., exh. E; Kurzrok rpt., def's mot., exh. F].

Kalekiristos complained to Dr. Ellis of neck and back pain and stiffness, difficulty sleeping, loss of memory, nervousness, chest pain, and shoulder pain. [Ellis rpt., def's mot., exh. E]. Full spine x-rays taken by Dr. Ellis "demonstrated alteration from normal

---

4. In the body of the defendant's motion, it states July 8, 1992; the exhibit however states the counseling session took place on July 6, 1992. The two-day discrepancy is not disputed by the parties.

5. In his opposition, the plaintiff "highly disputes" that he was counseled on this date, citing as evidence of his dispute his 1996 deposition testimony. [Pl's opp. at 4]. The plaintiff's exhibit of this testimony, however, makes no reference to a July 6 (nor July 8), 1992 counseling session. [Pl's dep., pl's opp. exh. 3, 178:2—182:6]. Nevertheless, this dispute is not material to the instant action.

structure including multiple osseous deviations." [Id.]. Dr. Ellis was of the opinion that:

> ... [the plaintiff] is suffering from acute traumatic cervical, thoracic and lumbar sprain/strain with a subluxation syndrome which is accompanied by ligamentous instability, myofascitis and localized evidence of nerve root irritation that is superimposed on a preexisting cervical and lumbar strain/sprain.

[Id.]. Dr. Ellis' report mentioned the work-related injury by date and notes that the plaintiff "was on full disability at the time of the accident." [Id.]. However, he placed no restrictions on the plaintiff's activities [Id.], and prescribed physical therapy. [Kurzrok rpt., def's mot., exh. F]. He also referred Kalekiristos to Dr. Neal Kurzrok, a neurologist. [Id.].

Upon hearing the plaintiff's litany of complaints and after physical examination, Dr. Kurzrok recommended (1) continued physical therapy by Dr. Ellis; (2) "[d]isability as per Dr. Phillips", noting the plaintiff had an appointment with Dr. Phillips for the following day; and (3) continued use of Motrin. [Id.]. He also prescribed Fioricet and recommended various diagnostic examinations. [Id.]. Dr. Kurzrok advised the plaintiff to return in approximately four months, and to call him if any problems arose in the interim. [Id.]. Kalekiristos did not return until the four month follow up appointment—April 8, 1994, which was after the date of his discharge from employment. [See Kurzrok rpt., def's mot., exh. K].

The day following Dr. Kurzrok's exam, December 15, 1993, Kalekiristos attended his scheduled appointment with Dr. Phillips. His report of that date notes that "EMG's and nerve conduction studies are normal" and that:

> The patient has multiple complaints; he also has multiple non anatomic and non physiologic findings. [Dr. Phillips] do[es] not feel there is anything significantly wrong with him. He is being allowed to return to work. He does not need any continuing workup or therapy. As a rou-

tine, to make sure he goes back to work, I will see him in three weeks.

[Phillips rpt., def's mot., exh. G]. Dr. Phillips released the plaintiff to return to work on "regular duty status" as of December 16, 1993. [Def's mot., exh. 3 to exh. C].

On December 20, 1993, Kalekiristos returned to work [EEOC compl., def's mot., exh. L]; on this same day, Ms. Lynch, an assistant housekeeping manager, reported to Ms. Ellis that Kalekiristos was not wearing his lift belt. [Def's mot., exh. 4 to exh. C]. Kalekiristos was verbally warned by Ms. Ellis about failing to wear his lift belt. [Id.]. A personnel file written account of the verbal warning states that Kalekiristos had been verbally warned of the same violation prior to his work-related injury. [Id.]. Although Kalekiristos does not deny he received the warning, he "adamantly denies that he did not wear his belt on the occasion at issue" and that "as far as he remembers he wore the belt under his jacket." [Pl's opp. at 4; see also pl's dep., 178:8–17]. As discussed under "disparate treatment" at 53 of this memorandum order, whether the plaintiff was wearing his belt on this date or prior to his work-related injury is not a genuine issue of material fact to the instant dispute.

Late in December or early in January 1994, Kalekiristos was reassigned by Ms. Lynch [6] to the position of "PM Line Runner", which is a 3:00 pm to 11:30 pm shift. [Pl's dep., 50:13–19]. The hotel states that the reassignment was related to its "prepar[ations] to subcontract out its laundry operation", and that all employees in the Mayflower Laundry Department were reassigned to other jobs throughout the hotel. [Defs pts & auth. at 4]. The plaintiff "hotly contest[s]" this fact, arguing that the transfer "constituted pretextual conduct on the part of the defendant." [Pl's opp. at 5]. The plaintiff contends that he "was never given a reason as to why the change in shift." [Id.; pl's dep., 50:13—51:8]. He also alleges that a March 14, 1994, letter from General Manager Jim Biggar, supports his contention that the hotel was not planning to contract out the

---

6. The plaintiff also asserts Ms. Maye reassigned him to the new position. [Pl's dep., 198:18– 199:11]. The contrary statements are not material to the instant dispute.

service as early as December, and that it did not make the decision until March 1994. [Pl's opp. at 5 and exh. 4]. Kalekiristos does not dispute, however, that 18 other laundry attendants, among whom he ranked 14th in seniority, were also reassigned as a result of the contract. [*See* pl's opp., exh. 4]. As discussed in the Title VII "pretext argument" section at 52 of this memorandum opinion, this dispute does not create a genuine issue of material fact.

In his new position of PM Linen Runner, Kalekiristos was responsible for "fully stock[ing] the eighteen linen closets on the Mayflower's nine guest floors." [Def's pts & auth. at 4; pl's workers' comp. dep., 13:3–15:23].

On December 30, 1993, Kalekiristos returned to Dr. Ellis. His examination disclosed a "decrease of the cervical range of motion[, although c]ervical and thoracolumbar orthopedic tests remain relatively constant." [Ellis rpt., def's mot., exh. I]. He placed *no restrictions* on the plaintiff's major life activities, including working.[7] [*Id*.]

On January 5, 1994, Kalekiristos followed up with Dr. Phillips, who reported:

[The plaintiff] has multiple non-anatomic and non-physiologic findings. I do not feel that there is anything wrong with this patient. I feel that there is gross exaggeration of his symptom complex. I feel that the patient does not need any orthopedic care, follow-up, or physical therapy. The EMG's and nerve conduction studies which were done to ensure that I was not being misled in my impression are normal. Patient can be working in his full and ordinary occupation. He has been told that there is no need for routine orthopedic follow-up.

[Phillips rpt., def's mot., exh. H].

On January 26, 1994, Kalekiristos returned to Dr. Ellis, who reported "improvement of the cervical range of motion. Cervical and thoracolumbar orthopedic tests remain relatively constant." [Dr. Ellis rpt., def's mot., exh. I]. Dr. Ellis did not place the plaintiff

on light duty nor did he restrict the plaintiff from any major life activities. [*Id*.]

On February 24, 1994, Ms. Ellis counseled plaintiff for failing to completely stock the third and tenth floor linen closets on February 23 [def's mot., exh. 6 to exh. C]; Kalekiristos refused to sign the written memorandum. [Def's mot., exh. 5 to exh. C]. Ms. Ellis told him that, if he was unable to fully stock the linen closets, he was "to leave a note in [her] office." [Def's mot., exh. 6 to exh. C; pl's dep., 71:6–19]. On February 25, Ms. Ellis found that the second, third, fourth, fifth, eighth and ninth floors were not completely stocked and Kalekiristos had left no note. [Def's mot., exh. 6 to exh. C]. Therefore, Kalekiristos was advised that "[a]ny further failure to complete work assignments as instructed will result in further disciplinary action." [*Id*.]. He refused to sign this written warning. [*Id*].

On March 1, 1994, Kalekiristos received a written warning from Ms. Ellis for failing, on February 28, to completely stock the nine guest floors and failing to leave a note; he was further warned "[i]f Abraha fails to finish work assignments on a timely [and] consistent basis or if he fails to leave a note for laundry manager regarding unfinished work assignments, strict disciplinary action may occur including termination." [Def's mot., exh. 7 to exh. C]. Kalekiristos refused to sign the written warning. [*Id*.]

On March 4, 1994, Kalekiristos followed up with Dr. Ellis, who noted "[e]xamination demonstrates a fluctuation of the cervical and thoracolumbar range of motion. There is mild improvement of the cervical orthopedic tests." [Ellis rpt., def's mot., exh. I]. Dr. Ellis imposed *no restrictions* on any of the plaintiff's major life activities, including working. [*Id*.]

On March 9, 1994, Kalekiristos was counseled by Ms. Ellis in the presence of Ms. Maye for failing to leave an accurate note of the items that needed to be stocked in the linen closets on March 8, and was suspended.

---

**7.** The EEOC definition of major life activities adopted by the ADA is: "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

[Def's mot., exh. 8 to exh. C]. He refused to sign the March 9, report. [Id.].

Kalekiristos returned to work on March 14, 1994, following the suspension. [Def's mot., exh. 9 to exh. C]. On this same day, the hotel issued a memorandum to all "Team Members" announcing the consolidation of the laundry services, and that the last day for processing linen and terry would be Saturday, March 26, 1994. [Pl's opp., exh. 4]. All employees were assigned, in the order of seniority, personnel appointments to discuss "current job opportunities" with Naomi Schmuckler, Assistant Director of Human Resources, and Ms. Maye. [Id]. Kalekiristos, 14th in seniority of 19 employees being displaced, was scheduled for a 1:20 pm meeting on March 16. [Id]. Also on March 14, the plaintiff was counseled by Ms. Swim, regarding his return to work from disciplinary suspension, advising him that it was more important—"of super importance", that he leave an accurate shortage list than to complete the stocking of the closet. [Def's mot., exh. 9 to exh. C]. That evening the plaintiff failed to stock all of the linen closets and again failed to leave an accurate note for the manager, which resulted in suspension on March 15 by Ms. Ellis. [Def's mot., exh. 10 to exh. C]. Mr. Rick Whitehurst, President of Union Local 25, was present during the disciplinary session, as was Ms. Schmuckler [id]; the plaintiff refused to sign the disciplinary report. [Id.].

Kalekiristos' opposition to the motion for summary judgment disputes that these counseling sessions with his supervisors (which are numbers 18 [8], 19, 20, 22, 23 and 24 of the defendant's Local Rule 108 statement of material facts not in dispute) ever took place. He argues, "that he never spoke to his immediate supervisors about his job performance as a p.m. linen runner." [Pl's opp. at 7, citing pl's dep., tr. 204:20—208:7]. Indeed, during his 1996 deposition, the plaintiff stated that he did not remember "that [he] ever spoke with Ms. Ellis or Ms. Maye about [his] performance as the p.m. linen runner and was never counseled by them." [Pl's dep., tr.

204:20–208:7]. However, he also admitted "they [did] talk to [him] about not completing stocking of the linen closets." [Id.]. Moreover, the plaintiff told Dr. Kurzrok on April 8, 1994, just a couple weeks after his discharge, that the hotel "gave him three warnings then fired him" [Kuzrok rpt., def's mot., exh. K]; his EEOC complaint filed January 6, 1995, states he received three written disciplinary reports, and [he] was subsequently terminated on March 24, 1994 [EEOC compl., def's mot., exh. L]; and in his sworn answers to interrogatories served two days prior to the October 1996 deposition, Kalekiristos identified Ms. Ellis as someone with knowledge regarding the instant dispute, describing her as:

> Plaintiff's supervisor who was [sic] issued three written warning reports on 3/1/94, 3/9/94, and 3/15/94 and counselled [sic] Plaintiff relative to his ability to complete his work assignments and to leave a note if he did not. Plaintiff informed her of his physical inability to complete his job assignments.

[Pl's opp., exh. 9 at 3, ¶ D]. The Court finds there is no genuine dispute as to whether three written warnings were issued. With regard to the dispute over verbal warnings issued February 24th and 25th, the plaintiff's mere conclusory denials, allegations and assertions unsupported by any evidence do not create a genuine issue of material fact. [See discussion of job performance at 662 of this memorandum opinion.].

On March 24, 1994, Kalekiristos was terminated for "inability to complete work assigned." [Def's mot., exh. 11 to exh. C]. Present at the disciplinary session were Ms. Swim, Ms. Maye, and Ms. Schmuckler; Kalekiristos refused to sign the personnel action form. [Id.]. He never filed a grievance pursuant to the hotel grievance procedure to protest his discharge or any other aspect of his treatment during his employment by the defendant. [Pl's dep., 215:1–218:6].

After his termination, Kalekiristos' position was temporarily filled by a then-current Mayflower employee, Mr. Terrance Henry,

---

8. No. 18 refers to a February 23, 1994, counseling session. The Court presumes this is a typographical error, and that it instead refers to a February 24, 1994, session, regarding work completed on February 23. [See def's mot., exhs. 5 & 6 to exh. C].

and permanently filled in May 1994, by Mr. John Mannah, a black native of Sierra Leon. [Def's pts & auth. at 6–7; def's mot., exh. 13 to exh. C; Mannah affidavit, def's mot., exh. J]. Mr. Mannah remained in the position of PM Linen Runner until December 1994, at which time he was promoted to the hotel accounting department as a night auditor. [Mannah affidavit, def's mot., exh. J]. The plaintiff disputes this material fact [no. 25], arguing, "Plaintiff contends that Terrance Henry is the person who replaced his position at the Mayflower Hotel when he was terminated." [Pl's opp. at 7]. He refers the Court to his answers to defendant's interrogatories for proof of his assertion. [Pl's opp. at 7, citing exh. 9]. The answers, however, only list Henry's name, but state nothing with regard to what information Henry could provide [pl's opp., exh. 9, at 2, ¶ C]; further, in the same interrogatory answers, the plaintiff names a Mr. Denton James as the person who "[r]eplaced plaintiff when he was terminated on March 24, 1994." [Pl's opp., exh. 9, at 4, ¶ L]. Additionally, in his deposition Kalekiristos repeatedly states he really does not know who replaced him. [Pl's dep., 148:21–149:1; 172:5–11]. The hotel does not dispute that Henry, an African–American, was his temporary replacement. [Def's mot., exh. 13 to exh. C]. As discussed in the Title VII section at 50–51, the plaintiff's dispute over whether Mannah replaced him does not create a genuine issue of material fact.

As noted on page 648 *supra*, on April 8, 1994, Kalekiristos followed up with Dr. Kurzrok, the neurologist to whom he was referred by his chiropractor, Dr. Ellis. [Kurzrok rpt., def's mot., exh. K]. Kalekiristos reported he was continuing to receive physical therapy from Dr. Ellis; he also reported that he received three warnings from his employer, and was then fired. *[Id.]*. By this April visit, Dr. Kurzrok had received Kalekiristos' prior medical records and results from the studies he requested, e.g., the cervical and lumbar spine films taken on December 27, 1993, MRI of the brain taken on December 17, 1993, MRIs of the cervical and lumbar spines, needle EMG/nerve conduction studies, an electroencephalogram, and brainstem auditory evoked responses. [Kurzrok rpt., def's mot., exh. K]. Dr.

Kurzrok's comments and recommendations were as follows:

COMMENT: Patient reports that neck pain and low back pain are no better with time and are not helped by physical therapy. Yet objective findings are lessening on examination and thus patient is clearly improving with time and physical therapy. I suspect that patient still has a significant degree of neck and low back discomfort and that is why he is unable to see his own improvement.

RECOMMENDATIONS: 1. Follow-up and physical therapy as per Dr. Ellis. 2. Patient could return to work (if such job existed) at least light duty. Further recommendations as per Dr. Ellis. 3. Discharged from [Dr. Kurzrok's] care at this juncture. [He] would be happy to reevaluate Mr. Kalekiristos in the future should he or any of his caretakers so desire.

[Kurzrok rpt., def's mot., exh. K]. On May 11, 1994, Kalekiristos was referred by his attorney in conjunction with his workers' compensation claim to Dr. Sagar Nootheti, an orthopedic surgeon, for a medical examination. [Def's stmt. of material facts, no. 32 (undisputed)].

Dr. Nootheti reviewed the records of Drs. Phillips and Cohen but did not review the MRIs or other studies. Dr. Nootheti diagnosed the patient as follows:

1. Chronic lumbosacral strain, possible disc herniation with left side radiculopathy, facet joint injury, L4–5, S1.

The patient has been treated with extensive physical therapy with minimum improvement ... at present, the patient is suffering from chronic pain syndrome with facet arthropathy and possible disc degeneration and chronic lumbar disc disease affecting L4–5, S1. The patient at present needs possible epidural injections to the lower back to relieve the symptoms. He also needs a work hardening program. If this does not help the problems, he may need surgery after further investigations.

At present, without further treatment, the patient has reached maximum medical improvement following the accident of 8/29/93. The partial permanent disability

rating of his lower back because of the persistent symptoms is 20% according to the AMA Guidelines.

[Nootheti rpt., pl's opp., exh. 13; def's mot., exh. M]. Nowhere in the report does Dr. Nootheti place any limits on the plaintiff's major life activities, including working. *[Id.]*.

On September 30, 1994 [9], Kalekiristos began employment with Diplomat Parking. [Def's mot., exhs. 3 and 4 to exh. A]. On his June 1, 1994, employment application, which the plaintiff completed in his own handwriting [pl's dep., 110:15–22], Kalekiristos left blank portions of the "physical record" section, which specifically asked him to identify "any physical defects" and to detail prior injuries, and any defects in hearing, vision and/or speech. [Def's mot., exh. 3 to exh. A].[10]

In the section of the application that asks the job applicant to identify and state the reason for leaving former employment, Kalekiristos stated "department closed" as his reason for leaving his position at the hotel. *[id]*. And the section that asks: "What Foreign Languages Do You Speak Fluently?", the plaintiff wrote two languages, one being "English", and he circled that he writes English fluently. *[id]*.

A "Termination Report" was submitted as "exhibit 4 to exhibit A" of the defendant's motion. It is unclear who completed the report, but it states that Kalekiristos was employed by Diplomatic Parking until March 27, 1995, at which time he quit because he "did not like work". [Def's mot., exh. 4 to exh. A]. Kalekiristos disputes this fact, stating he "stopped working because of pain." [Pl's mot. at 8; pl's dep., 7:6–21]. The reason he left this job in March 1995 is immaterial to the instant dispute.

On January 6, 1995, Kalekiristos filed a complaint with the Equal Employment Opportunity Commission, alleging that he was discriminated against between December 20, 1993, and March 24, 1994, on the basis of race, national origin and disability. [EEOC compl, def's mot., exh. L]. He contended that "[his] employer refused to tell [him] the reason [he] was fired, however, during the [unemployment] compensation appeal hearing, my employer asserted that I was fired for misconduct." [Id]. His EEOC complaint further alleged, "[a]fter the hearing, the examiner found that I was not fired for misconduct, I was fired because of my medically documented disability." *[Id]*. The plaintiff submitted no evidence of the Board's finding.

On March 23, 1995, Kalekiristos' workers' compensation claim was dismissed because he failed to attend a medical examination by a physician selected by the employer. [Order, defs mot., exh. N]. His appeal of the dismissal to the District of Columbia Court of Appeals was dismissed March 7, 1996, for failure to exhaust administrative remedies. [Order, def's mot., exh. P].

On January 4, 1996, Kalekiristos was examined by Dr. Richard Edelson, a neurologist, for injuries resulting from an altercation with a Citibank branch office teller in December 1995.[11] Dr. Edelson reported the plaintiff stated that prior to this altercation/injury "his general health had been excellent. He has no underlying medical illnesses and is on no medications. He does not smoke or drink. He was involved in an automobile accident in 1993, but had full recovery." [Edelson rpt., def's mot., exh. O]. The report makes no mention of neck or back pain, nor of the August 29, 1993, washer-loading accident. *[Id.]*.

---

9. The plaintiff's response to employer's interrogatories in the workers' compensation claim states his employment with Diplomatic Parking began in November 1994 [*see* Def's mot., exh. 1 to exh B. at 5], but in his answers to interrogatories served October 1996, the plaintiff states that his date of hire was September 1994. [Pl's opp. exh. 9]. This conflict in date is not material to the instant action.

10. The plaintiff denies that the omissions are material facts, but argues that, if the Court considers them material facts, the determination of

whether it is a prior inconsistent statement should be left to the jury [pl's opp. at 7]; the Court does not consider the omissions as material facts.

11. Plaintiff's personal injury complaint against Citibank filed September 20, 1996, in D.C. Superior Court, states the altercation took place on or about December 18, 1995 [def's mot., exh. T]; Dr. Edelson's report states it took place on December 28, 1995 [Edelson rpt.,defs mot., exh. O].

On January 13, 1996, the plaintiff began treatment with Dr. Richard A. Virgil, a psychiatrist, for injuries related to the Citibank incident. [Virgil rpt., def's mot., exh. R]. On June 26, Dr. Virgil issued a report concluding:

Mr. Kalekiristos would appear to be suffering from a severe post traumatic stress reaction. He has developed characteristic symptoms following the assault on his person by the bank teller. This stressful syndrome would be markedly distressing to anyone and has been experienced with fear, terror and helplessness. The patient now avoids stimuli associated with the event, namely Black American males and continues to obsess that he may be victimized again by the assailant. He has continued to experience distressing dreams in which he is grabbed and choked, although these occur now to a lesser degree. Persistent symptoms of increased arousal that were not present before the trauma include difficulty falling or staying asleep (including traumatic nightmares) and middle or terminal sleep disturbances. Mr. Kalekiristos continues to make progress and I feel supportive psychotherapy and medication continue to be warranted.

[*Id.*].

At the defendant's request, Kalekiristos was examined by Dr. Robert Gordon, an orthopedic surgeon, on September 12, 1996. [Gordon rpt., def's mot., exh. S]. Dr. Gordon reported that the plaintiff complained of low back pain, "particularly if he is sitting for very long or if he is lying in bed for very long." [*Id.*]. After reviewing Dr. Phillips' records and examining the patient, Dr. Gordon observed, "[t]here is nothing in my examination of the patient or my review of the medical records that have thus far been provided that indicate [sic] that anything other than muscular strain may have occurred." [*Id.*]. He also reviewed the MRI report, noting "at least according to the report which [he] ha[s] reviewed, it appears to have shown some pre-existing congenital or degenerative changes, but there was no indication of any acute abnormalities related to this accident." [*Id.*]. Dr. Gordon concluded,

based on [his] examination of the patient and [his] review of the medical records that have thus far been provided, [he] see[s] no objective evidence of any residual or permanent impairment as a result of the 8–29–93 accident. If his work was quite strenuous then certainly is [sic] would have been reasonable for him to have missed several weeks of work as a result of this injury but there was nothing to indicate to [him] that any prolonged period of disability would have been appropriate. There is also nothing, in [his] opinion, that indicates that there are any residuals from this accident that would preclude [the plaintiff] from any type of work activity that he was capable of doing prior to the 8–29–93 injury.

[*Id.*].

### III.  Analysis

#### A.  Title I of the Americans with Disabilities Act of 1990

Title I of the Americans with Disabilities Act [ADA] provides that:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Kalekiristos complains that "[u]pon [his] return to work at the Stouffer Mayflower Hotel as a laundry attendant in December 1993, defendant ... forced him to do the work normally assigned to three people, i.e. stock ten hotel floors linen closets with towels, linen, etc. Previously, plaintiff was assigned to stock only three (3) floors. Plaintiff was forced to transfer from day to evening shift to perform his new job duties ... [and that the] new job duties were forced upon plaintiff even though defendant knew that plaintiff was suffering from a physical disability that without reasonable accommodation, would not allow him to perform the said work duties. Had plaintiff been reasonably accommodated by defendant, he would have been able to competently

complete his job related duties." [Pl's amend. compl. at 3–4, ¶¶ 1–2].

The hotel has moved for summary judgment on the grounds that the plaintiff cannot establish the elements of a claim of disability discrimination: specifically, that he was suffering from a physical impairment that substantially limited a major life activity while he was employed at the Mayflower. The defendant further argues that despite the lack of impairment, the laundry department accommodated his complaints. [Def's pts & auth. at 12–20].

In the instant action, the plaintiff proffers no direct evidence that he was fired because of a disability: he offers no evidence of discriminatory remarks or actions by his employer regarding his alleged disability, nor does he offer any information regarding the abilities of other hotel employees. In fact, he repeatedly stated that he was never given a reason for his termination. [Pl's workers' comp. dep., 72:2–4; 72:21–23; exh. 1 at 4 to pl's workers' comp. dep.]; *See Flasza v. TNT Holland Motor Express, Inc.*, 159 F.R.D. 672, 676 (N.D.Ill.1994).

Because, as in the instant action, direct evidence of employment discrimination is rare, an ADA plaintiff may rely on the burden-shifting method established in the Title VII case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See, e.g., Whitbeck v. Vital Signs, Inc.*, 934 F.Supp. 9, 13 (D.D.C. 1996); *Henry v. Guest Servs., Inc.*, 902 F.Supp. 245, 250 (D.D.C.1995). To prove a claim under *McDonnell*, an ADA plaintiff bears the burden of producing evidence establishing that: (1) he belongs to a protected class, i.e, has a disability recognized under the ADA; (2) he is qualified for the position and performs the essential functions of the job satisfactorily with or without reasonable accommodations; (3) he was dismissed despite his qualifications and performance; and (4) he was ultimately replaced by a person sufficiently outside the protected class to create an inference of discrimination. *See id.*, 411 U.S. at 802, 93 S.Ct. at 1824; *St. Mary's*, 509 U.S. at 505, 113 S.Ct. at 2746.[12]

If a plaintiff establishes a prima facie case, a rebuttable "presumption [arises] that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). A defendant then has the burden of producing evidence contesting the plaintiff's prima facie case and/or of producing evidence of some legitimate, nondiscriminatory reason for the

---

**12.** In line with the prima facie showing for other forms of employment discrimination, this Court, as many other trial courts have, shall include a fourth element to the prima facie case for disability discrimination: *that the plaintiff was replaced by a non-disabled person. See, e.g., Hutchinson v. United Parcel Service, Inc.*, 883 F.Supp. 379, 394 (N.D.Iowa 1995)

"[T]he district courts have hit upon two possible formulations ... in one group ... a plaintiff must establish (1) that he or she is a disabled person within the meaning of the ADA; (2) that he or she is qualified, that is, with or without reasonable accommodation (which the plaintiff must describe), he or she is able to perform the essential functions of the job; and (3) that the employer terminated the plaintiff, or subjected the employee to adverse decision, 'because of' the plaintiffs disability ..." In another group are those courts applying a prima facie case more obviously adapted from the one used in other employment discrimination cases ... (1) that he or she is disabled within the meaning of the ADA; (2) he or she is a "qualified individual" within the meaning of the ADA; (3) the plaintiff was subject to an adverse employment decision; and (4) the

plaintiff was replaced by a non-disabled person or was treated less favorably than non-disabled employees.... Other courts, without deciding the precise formulation of the prima facie case have held that failure to make some specific showing meant that the plaintiff could not establish a prima facie case ... hence, the plaintiff must show that he or she suffered an adverse employment decision, and that plaintiff was replaced by a non-disabled person, one with a lesser disability, or one whose disability is more easily accommodated, or the plaintiff was treated less favorably than non-disabled employees, those with lesser disabilities, or those whose disabilities are more easily accommodated ... however, the court does not believe that the protections of the ADA come into play only if the disabled plaintiff was replaced by or treated less favorably than a non-disabled person, just as in an ADEA case, it is not necessary that the plaintiff be replaced with a person from outside the protected class, only that the plaintiff be replaced by a younger person."

Under either of the aforementioned guidelines, Kalekiristos has failed to establish a prima facie case.

adverse personnel action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. The defendant satisfies this burden by "produc[ing] admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096. If the defendant meets its burden of production, the "ultimate burden" shifts back to the plaintiff to show that the proffered reasons for the discharge were "a pretext for discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993). To carry this burden, the plaintiff must produce evidence that "both that the [proffered] reason was false, and that discrimination was the real reason." *Id.* At all times a plaintiff bears the ultimate burden of proving that he has been the victim of illegal discrimination based on his disability. *See id.* at 506–511, 113 S.Ct. at 2746–50.

### B. The Prima Facie Case: "Qualified Individual With A Disability"

The ADA forbids discrimination "against a qualified individual with a disability because of the disability of such individual". 42 U.S.C. § 12112(a); *see, e.g., Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995). Therefore, an ADA plaintiff bears the initial burden of producing evidence that he is a qualified individual with a disability. "[M]erely having a disability does not automatically extend the protections of the ADA to that individual. Congress specifically limited the ADA's protections to only those disabled individuals who are otherwise qualified to hold the position in question". *Dockery v. North Shore Med. Ctr.*, 909 F.Supp. 1550, 1555 (S.D.Fla.1995).

Title I of the ADA defines "disability" as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The ADA protects "qualified individual[s] with a disability", who are defined as:

... individual[s] with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires ... consideration shall be given to the employer's judgment as to what functions of a job are essential ...

42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(m) [13]. In the instant action, the defendant seeks summary judgment on the grounds that the plaintiff cannot prove that he is a member of the class protected by the ADA—that is, that he is a "qualified individual with a disability." The defendant argues that the "[p]laintiff is not substantially limited in any activity and, moreover, he did not request any accommodation which he was denied." [Def's pts & auth. at 13].

The plaintiff describes his disability as follows:

*Question:* "... What disability were you suffering from at the time?"

*Witness:* "The injury that I incurred at the hotel, compounded with the injury of the auto injury. I was feeling pain whenever I pulled or pushed anything."

*Question:* "What part of your body hurt, again?"

*Witness:* "My upper back and my neck—lower back and my neck."

*Question:* "And so it was basically the pain that you are referring to?"

*Pl's Attorney:* "Objection. You can answer if you can."

*Witness:* "I just know that I felt pain."

[Pl's dep., 52:7–19]. But in neither his amended complaint nor his opposition to the defendant's motion for summary judgment does Kalekiristos state on which of three alternative theories of disability outlined in 42 U.S.C. § 12102(2) he relies: (1) a physical or mental impairment that substantially limits a major life activity, (2) a record of such

---

**13.** (m) Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position. 29 C.F.R. § 1630.2(m).

impairment, or (3) being regarded as having such an impairment. Instead, in his opposition to the summary judgment motion, Kalekiristos relies entirely on a report of a physician based on an examination that took place almost two months after he was terminated from his job, and almost five months after he received from a doctor of his own choosing not one, but two clean bills of health to return to work on full duty—with no restrictions. The Court finds that Kalekiristos has not established a genuine question of material fact with regard to whether he suffered from disability protected by the ADA during the period of alleged discrimination because, as shown below, he has not made a prima facie case of any of the three alternative theories of disability outlined in 42 U.S.C. § 12102(2).

### 1. First Element: Membership in the Protected Class

#### (a) 42 U.S.C. § 12102(2)(A)

#### A Physical Impairment that Substantially Limits One or More Major Life Activities

"A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA. The statute requires an impairment that substantially limits one or more of the major life activities." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir.1995). "Substantially limits" and "major life activities" are not defined by the ADA, but they are defined by regulations promulgated by the EEOC under the ADA:

*Major life activities* are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). " 'Other major life activities could include lifting, reaching, sitting, or standing.' " *Ray v. Glidden Co.*, 85 F.3d 227, 229 (5th Cir.1996)(quoting *Dutcher*, 53 F.3d at 726 n. 7).

*Substantially limited* is defined by the EEOC regulations as "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii)[s]ignificantly restricted as to the condition, manner or duration under which an

individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. 1630.20)(1). "With respect to the major life activity of *working* ... [t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. 1630.2(j)(3)(i)(emphasis added).

The Court is further guided by the six factors set forth in the ADA regulations. The first three "should be considered" when determining whether an impairment "substantially limits" a major life activity:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment

29 C.F.R. § 1630.2(j)(2); and the additional three factors "may be considered" when determining whether an impairment substantially limits the major life activity of *working:*

(A) [t]he geographical area to which the individual has reasonable access;

(B) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes)

*id.* § 1630.2(j)(3)(ii); *see Bolton v. Scrivner,* 36 F.3d 939, 943 (10th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995); *accord Welsh v. City of Tulsa, Okla.,* 977 F.2d 1415, 1419 (10th Cir.1992)(citing *Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1249 (6th Cir. 1985)).

### (i) Plaintiff's Ability to Perform Major Life Activities Other Than Working

■ A court first examines whether the impairment substantially limited a major life activity other than working—the normal activities of daily living. As the defendant argues, the plaintiff has presented no evidence that he is unable to perform the basic activities that the average person in the general population performs with little or no difficulty. The record in the instant action is devoid of any evidence that the plaintiff was unable to perform functions such as caring for himself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, lifting, reaching, sitting or standing during the period of the alleged disability discrimination. The plaintiff did complain about "pushing and pulling", but has not demonstrated that he was substantially limited in the performance of that activity, nor did his physicians limit his lifting, pushing or pulling in the performance of his daily life activities. He was returned to full duty status, and the physicians who treated Kalekiristos during the alleged discrimination period did not place him on restricted duty status nor did they restrict any of his major life activities. [*See* Phillips rpt., def's mot., exh. H; Ellis rpt., def's mot., exh. I]; *see also Ray,* 85 F.3d at 229 (quoting *Dutcher,* 53 F.3d at 726, finding that the plaintiff "can lift and reach as long as he avoids heavy lifting", and "inability to perform that discrete task [of heavy lifting] does not render a person substantially limited in a major life activity").

With regard to the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long-term impact of the impairment, the Court again turns the physician reports. None of the 6 physicians, which included three orthopedic surgeons, two neurologist,

one chiropractor—who treated Kalekiristos prior to his return to work from the work-related injury that the plaintiff claims was exacerbated by his auto accident, during his remaining months at the defendant hotel after he was returned to full duty by his physician, and/or since his discharge—none placed any limitations on the plaintiffs activities either before or after Dr. Phillips returned the plaintiff to full duty. [*See* def's mot., exhs. D, E, F, G, H, I, K, M, O].

■ Opposing the summary judgment motion, the plaintiff relies entirely on a report by Dr. Nootheti, an orthopedic surgeon, who gives the plaintiff a 20% AMA disability rating. Dr. Nootheti, however, imposes absolutely no limitations on the plaintiff's activities. [Pl's opp., exh. 13]. Moreover, physician reports that, like Dr. Nootheti's, were generated after the plaintiff was terminated from his job and reports about which the defendant employer had absolutely no knowledge nor access prior to terminating the plaintiff can not serve as the *sole* evidentiary basis of establishing an element of a prima facie case of disability discrimination. A person alleging a disability protected by the ADA has a burden of establishing with medical evidence the existence of the alleged disability, and presenting the documentation during the term of employment, not following termination. "To hold otherwise would render the requirement of a physical impairment superfluous and meaningless and would allow anyone with any kind of condition, regardless of the severity, to claim a physical impairment." *See Farley v. Gibson Container Inc.,* 891 F.Supp. 322, 326 (N.D.Miss.1995). An employer cannot accommodate a disability of which it is unaware; moreover, "[e]mployers should not be expected to recognize a physical impairment solely on an employee's 'say-so,' ... The logical consequences of such blind acceptance are simply too obvious to state." *Id.; see also Quinley v. State Farm Ins. Corp.,* 1996 WL 544258, *7, CA No. 95–271 (S.D.Ala.1996)(discussing post termination medical records)("the Court is not impressed with [the plaintiff's] evidence ... the Court notes that all of her supporting letters are dated subsequent to her June 1993 reassign-

ment ... thus, [the plaintiff] has produced no evidence that she was subject to physical restrictions at the time of her job reassignment.")

In sum, the plaintiff has produced no evidence that he was substantially limited in the performance of normal activities of daily living.

### (ii) Plaintiff's Ability to Perform Major Life Activity of Working

■ Mr. Kalekiristos failed to establish that he is substantially limited with respect to any other major life activity, so the Court will consider (applying the six factors outlined in the EEOC regulations, *supra* at 656), his ability to perform the major life activity of working. An individual is substantially limited in the major life activity of working if his disability disqualifies him from a class of jobs or a broad range of jobs. *See* 29 C.F.R. § 1630.2(j)(3)(ii); *accord Bolton*, 36 F.3d at 942; *Dutcher*, 53 F.3d at 727; *Dotson v. Electro–Wire Prods., Inc.*, 890 F.Supp. 982, 988 (D.Kan.1995).

In the instant action, Kalekiristos has presented no evidence with respect to his ability or inability to perform either a class of jobs or a broad range of jobs in various classes. None of his doctors disqualified him from any jobs; even Dr. Nootheti, whose report can only be read in conjunction with other evidence because the examination was performed after the plaintiff's termination, did not disqualify him from any particular kind of work. *See Dotson*, 890 F.Supp. at 988 (explaining *Bolton*, 36 F.3d at 944):

> In the state worker's [sic] compensation proceeding, Bolton was found to have a nine percent permanent partial disability to his right foot and a twenty-nine percent permanent partial disability to his left foot ...'this evidence, however, does little to show that Bolton is restricted from performing a class of jobs ... instead, the evidence goes to the nature and severity, duration, and impact of Bolton's impair-

ment[14]—the factors listed in 29 C.F.R. § 1630.2(j)(2).'

■ The plaintiff asserts his pain prevented him from working—pushing and pulling. That is not enough to establish he is substantially limited in the overall performance of working. "[T]he inability to perform one aspect of a job while retaining the ability to perform the work in general does not amount to substantial limitation of the activity of working." *Dutcher*, 53 F.3d at 727; *accord Dotson*, 890 F.Supp. at 989; *Welsh*, 977 F.2d at 1418 (explaining *Jasany*, 755 F.2d 1244).

Mr. Kalekiristos' self-prescribed work restrictions do not establish he is restricted in any major life activity, including performing a class of jobs or a broad range of jobs in various classes. [*See* 29 C.F.R. 1630.2(j)(3)(ii) ]. Kalekiristos has not met the burden of showing an impairment that substantially limits his major life activities, including working.

### (b) 42 U.S.C. § 12102(2)(B)

### A Record of Such an Impairment

■ Having concluded the plaintiff is not substantially limited in performing any major life activities, including working, thus not disabled within the meaning of 42 U.S.C. § 12102(2)(A), the Court considers whether Kalekiristos is disabled within the meaning of subsection (B), i.e., that he established a record of such impairment. The Court finds there was no record of such an impairment.

■ "A record of such impairment" is defined by the ADA regulations as "a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). Section 12102(2)(B) "is intended to address discrimination that occurs because of an individual's history of a disability or because of an individual's misclassification as disabled." *Dot-*

---

**14.** As the Tenth Circuit observed with regard to plaintiff Bolton, other evidence contradicts the purported extensive and permanent nature of Kalekiristos' impairments. *See Bolton*, 36 F.3d at 944 n. 3. As noted, Dr. Nootheti's report must be read in conjunction with the reports from the other physicians who treated the plaintiff during the period of discrimination, and who, like Dr. Nootheti, saw no need to restrict any of the plaintiff's major life activities, including working. Also, the plaintiff stated that he would still be employed—thus conceding his employability, at the defendant hotel today, had he not been terminated. [*See* Pl's dep., 246:17–248:9].

*son,* 890 F.Supp. at 990. "The fact that an individual has a record of being a disabled veteran, or of disability retirement, or is classified as disabled for other purposes does not guarantee that the individual will satisfy the definition of 'disability' under part 1630"; the record must demonstrate the individual is substantially limited in the performance of a major life activity. *Id.* Medical records are indeed the kind of records where disability information might be found; however, as explained at 657 *supra,* a medical record generated two months past the date of termination that, most importantly, places no limitations on the plaintiff's activities, does not meet the plaintiff's burden of establishing a record of such impairment.

The plaintiff relies solely on Dr. Nootheti's report, which refers to the AMA guidelines. Nowhere in the ADA does it state that a person disabled pursuant to the AMA guidelines is a qualified individual with a disability, and the plaintiff has provided no such authority. The Court also notes Dr. Phillips' return-to-work note returned Kalekiristos to full duty without limitation. The return-to-work record was the only medical record of which the defendant employer was aware. The plaintiff may dispute the accuracy of the total absence of return-to-work restrictions, but that does not establish a record of an impairment that rises to the level of a disability protected by the ADA. *See Farley,* 891 F.Supp. at 325–326. Mr. Kalekiristos has not established a record of a disability that rises to the level of those afforded protection by the ADA.

### (c) 42 U.S.C. § 12102(2)(C)

### Being Regarded as Having Such an Impairment

■ Since the plaintiff has neither established a physical impairment that substantially limits his ability to perform major life activities, nor a record of such impairment, the plaintiff can only satisfy the first element of his prima facie case if he can show he was regarded by his employer as having such an impairment. He has made no such showing.

This definition of a disabled individual under the ADA "is included to disabuse employers of myths about the disabled and to prohibit discrimination against those with an impairment that does not substantially limit major life activities." *Flasza,* 159 F.R.D. at 678 (citations omitted).

ADA regulations define an individual "regarded as having such an impairment" in three ways:

(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

(3) Has none of the impairments defined in paragraphs (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(*l*)(1). Subsections (1) and (3) "requires proof that the employer perceives or believes the employee to have an impairment that is substantially limiting. [Subsection (2)] turns on proof that the employer's attitude toward the employee's impairment results in an impairment that is substantially limiting." *Dotson,* 890 F.Supp. at 991.

■ As noted, the hotel received a physician report from Dr. Phillips returning Kalekiristos to full duty. Nevertheless, he continued to complain to his supervisors and union representatives of back pain. While the employer did accommodate Kalekiristos' complaints, the accommodation is insufficient to demonstrate that the hotel regarded the plaintiff as having a disability. "In order to fall within the 'regarded as' definition, the plaintiff must prove that the defendant considered the plaintiff's impairment to foreclose not simply a particular job, but the type of employment involved generally." *Venclauskas v. State,* 921 F.Supp. 78, 82 (D.Conn. 1995); *accord Hutchinson,* 883 F.Supp. at 391 & 396. No evidence has been presented that the defendant ever regarded the plaintiff's alleged injury to foreclose employment in the laundry department in general or, for that matter, at all. Nor has any evidence been presented by Kalekiristos that the em-

ployer "perceived or believed" he had a substantially limiting impairment.

Since Kalekiristos failed to demonstrate that he falls under any of the three categories of disability set out in 42 U.S.C. § 12102(2), he fails to establish the first element of a prima facie case; viz—that he belongs to a protected class. Therefore, the defendant employer is entitled to summary judgment as a matter of law on this issue.

### 2. Second Element:

### Can Perform Essential Functions of Job With or Without Accommodation

■ Although the plaintiff failed to clear the first hurdle; the Court will consider all the elements of the prima facie case. The second element requires a plaintiff, once he or she establishes membership in the protected ADA class, to then make a showing that he or she is a "qualified individual with a disability". In order to show that he is a "qualified individual with a disability", Kalekiristos must show that a reasonable jury could find that he could perform, with or without reasonable accommodation, the essential functions of the PM Linen Runner position. 42 U.S.C. § 12111(8). After the essential functions of a job are identified, determining whether an individual with a disability is 'qualified' involves a two-step analysis: First, is the individual qualified for the position; second, has the individual demonstrated that he could perform the essential functions of the position with or without reasonable accommodation. *Hirschhorn*, 913 F.Supp. at 1398–1399; *see* 29 C.F.R. § 1630.2(m).

■ "Essential functions are the central position requirements, bearing more than a marginal relationship to the job." *Amariglio v. National Railroad Passenger Corp.*, 941 F.Supp. 173, 178 (D.D.C.1996)(citing 29 C.F.R. § 1630.2(n)). Courts defer "to the employer's judgment as to what functions of a job are essential". 42 U.S.C. § 12111(8); *accord Hirschhorn*, 913 F.Supp. at 1399; *EEOC v. Kinney Shoe Corp.*, 917 F.Supp. 419, 426 (W.D.Va.1996). The EEOC guidelines also are instructive in determining when a job function is essential. *Haysman*, 893 F.Supp. at 1101. "A function may be considered essential for several reasons, including ... the fact that there are a limited number of employees among whom the performance of the function can be distributed." *Id.* (citing 29 C.F.R. § 1630.2(n)(2)(ii)). Other relevant evidence of whether a particular function is essential includes the amount of time required to perform the particular function, the consequences of not requiring that such function be performed, and the work experience of former and current employees holding the same position. *Haysman*, 893 F.Supp. at 1101.

■ In the instant action, there was one essential function of the PM Linen Runner—he or she was to stock the two linen closets on each of the nine guest floors. In response to the plaintiff's physical complaints, however, a second essential function was added to the job—the plaintiff was required to leave a brief note stating which closets were short of linen. In essence, leaving the note became the primary essential function of the job:

> *Question:* "When you were transferred to the line runner's job, were you ever told that it was all right if you weren't able to stock all 18 linen closets, as long as you left an accurate listing of what you were not able to do?"

> *Pl's Attorney:* "Objection. You can answer if you can."

> *Question:* "Were you ever told that?"

> *Witness:* "Yes. I was told that. But there was a form, titled 'Runner Sheet' that we had used for the past three years. In addition to that, I used to write down whatever was completed or not completed and just post it for them to see."

[Pl's dep., def's mot., exh. A, 71:6–19]

> *Witness:* "There is a form that's already prepared by the hotel which is preprinted to keep a tally of the work that I have done, but I was asked to write extra explanation of how much I have accomplished."

> *Question:* "Were you able to do that?"

> *Witness:* "Yes, I have written that, and I would tape it for the manager so she could see it—tape it up so she could see it when she comes in in the morning."

*Question:* "And my question is, and I think you answered it was: Wasn't it more important—well, wasn't it as important that you—well strike that. Weren't you told that it was all right if you didn't complete every floor, as long as you left an accurate note of what you had and had not completed?"

*Pl's attorney:* "Objection to form. You can answer it, Mr. Abraha."

*Witness:* "Yes, I was told if I couldn't finish, that's all right, but I have to leave an accurate description of how much I have done, and I did that. I always left her a note of how much I have accomplished during the evening."

[Pl's workers' comp. dep., 19:2–20:5].

■ The inquiry now turns to whether the plaintiff could perform the two essential functions of the PM Linen Runner position. No dispute exists as to the plaintiff's qualifications for the PM Linen Runner positions [15]; accordingly, we must then consider the evidence with respect to the second essential function, the reasonable accommodation of leaving a note added to the plaintiff's duties in response to his verbal complaints of neck and back pain.

The plaintiff argues that his English language skills or lack thereof render him disqualified for the essential function of leaving a note, thus forcing him to leave the note was not a reasonable accommodation, but instead pretext for national origin discrimination. However, as shown by the following excerpts from his deposition, Kalekiristos conceded that he indeed was able to communicate in the English language both orally and in writing to perform the written requirements of the PM Linen Runner position:

*Question:* "You spoke enough [English] to do your job at the Mayflower; correct?"

*Pl's Attorney:* "Objection. You can answer if you can."

*Witness:* "Yes."

*Question:* "Can you write in the English Language—read and write?"

*Witness:* "Yes."

[Pl's dep., def's mot., exh. A, 11:3–15].

*Question:* "Do you see anything on [the Diplomat Parking Employment Application] that is not your writing?"

*Witness:* "Everything that is on top is not my handwriting."

*Question:* "That would be everything above the words reapplication for Employment?" '

*Interpreter:* "Yes, that is what he is indicating."

[Pl's dep., 110:15–22; page ends; p. 111 isn't provided by either party].

*Question:* "If you are not fluent in English, why did you put it on this [Diplomat Parking application] form?"

*Witness:* "I am just saying that I can communicate to do the job. That is all I am saying. A job in the parking lot and what is required is for me to go park cars and bring cars; that doesn't take much communication."

*Question:* "But the question doesn't say what foreign languages do you speak well enough to park cars. It says what foreign languages do you speak fluently?"

*Witness:* "I just know how to communicate. To me, this is fluent."

*Question:* "What does fluent mean to you?"

*Witness:* "It is meaning being able to communicate."

*Question:* "Did you have anybody help you fill out this form?"

*Witness:* "No. I filled it out myself."

[Pl's dep., 112:4–20]

*Question:* "Do you speak enough English, or did you speak enough English to function in your job at the Mayflower Hotel?"

*Witness:* "Yes, I did; enough to communicate for my job."

*Question:* "Where [sic] you also able, or are you also able to write English?"

---

**15.** The Court concludes the plaintiff is "otherwise qualified" for the linen runner position by virtue of the fact that he performed the duties on a part-time basis from the date he was hired by the hotel until his work-related injury, and on a full-time basis from soon after he returned from injury leave until his termination. *See Gomez,* 940 F.Supp. at 259.

*Witness:* "Yes, I do."

[Pl's workers' comp. dep., 7:22–8:6]

Having determined that the plaintiff was qualified for both essential functions, the Court examines whether the plaintiff demonstrated that he could perform the essential functions of the job. The Court first examines whether the plaintiff could perform the essential functions without reasonable accommodation; if not, the Court determines whether there was any reasonable accommodation by the employer that would have enabled him to perform those functions. *Chandler*, 2 F.3d at 1393–1394. This inquiry is not limited solely to *ability* to perform; it also involves demonstrating that "work performance met the employer's legitimate job expectations". *Kelly v. Drexel Univ.*, 907 F.Supp. 864, 873 (E.D.Pa.1995).

The Court immediately moves to the second step because Kalekiristos, through his persistent complaints of pain, admitted he could not perform the essential function of stocking the shelves without reasonable accommodation. The defendant employer reasonably accommodated those complaints by asking the plaintiff to leave a note for the morning supervisor listing the linen shortages. The plaintiff disputes the reasonableness of the accommodation, alleging in his amended complaint that his "new job duties were forced upon plaintiff even though defendant knew that plaintiff was suffering from a physical disability that without reasonable accommodation, would not allow him to perform the said work duties. Had plaintiff been reasonably accommodated by defendant, he would have been able to competently complete his job related duties. Plaintiff's physical disability is a twenty (20) percent permanent partial disability in his lower back, inter alia." [Pl's amend. compl. at 4, § VIII, ¶ 2].

"[A]n employer is not expected to accommodate disabilities of which it is unaware." *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 69 (3d Cir. 1996). " 'In general ... it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed. When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation." ' *id.* (citing 42 U.S.C. § 12111(9); 29 C.F.R. app. § 1630.9 (1996)). In the instant action, despite the lack of medical documentation of the plaintiff's symptoms and in the absence of suggestions of accommodations by the plaintiff, the hotel accommodated the plaintiff's complaints, advising him that it was unnecessary that he completely stock all of the linen closets provided he left an accurate of the linen shortages in the 18 linen closets. This was not an unreasonable request [16] and it certainly falls within the essential functions of the job—that is, it was essential that the closets be fully stocked in order for the morning shift employees to efficiently complete their work. The plaintiff argues that requiring him to leave the note was redundant because he was already required to complete a linen runner sheet. [Pl's opp. at 6]. In the hotel's judgment, however, the simple task of writing a note informing the morning shift of shortages in the event the closets were not fully stocked was the most efficient means of ensuring the morning shift's tasks were completed.

The parties dispute whether Kalekiristos' work performance met the employer's legitimate job expectations. As it is the plaintiff's work performance that the defendant proffers as the legitimate, non-discriminatory

---

**16.** Normally, the reasonableness of the accommodation is discussed from the standpoint of whether the plaintiff's accommodation request was reasonable in the given employment situation. In the instant action, the defendant took it upon itself to provide reasonable accommodation without a request by the plaintiff. "By definition, the determination of reasonableness is an objective analysis, not a subjective one dominated by either party's concerns. In assessing objective reasonableness, the governing statute provides guidance. See 42 U.S.C. § 12111(9). It provides that *'reasonable accommodation* may include' a number of listed measures; obviously Congress considered these types of accommodations to be reasonable. Examples in § 12111(9)(B) include 'job restructuring, ... reassignment to a vacant position, [and] acquisition or modification of equipment or devices." ' *Williams v. Channel Master Satellite Systems*, 101 F.3d 346, 350 (4th Cir.1996).

reason for Kalekiristos' termination, the burden is on the plaintiff to refute defendant's allegations that his work performance was unsatisfactory; he must provide evidence that "both that the [proffered] reason [for termination] was false, and that discrimination was the real reason." *St. Mary's,* 509 U.S. at 515, 113 S.Ct. at 2752. While the plaintiff has failed to show any evidence other than blanket denials of his poor job performance and disciplinary action and failed to demonstrate that other employees were treated more favorably, the defendant has presented evidence of disciplinary reports and evidence that the same duties were expected of the plaintiff's replacement, John Mannah. Mr. Mannah's affidavit states, "When I was the Mayflower's 'P.M. Linen Runner,' I was responsible for stocking all 18 linen closets on the Hotel's guest floors during my shift. I was also instructed, however, that if I was unable to complete stocking the linen closets during my shift, it was acceptable if I left an accurate list which linen closets were short what items." [Mannah affidavit, def's mot., exh. J].

▇▇▇ Plaintiff argues the accommodation was not reasonable, but suggested no other reasonable accommodations. While Kalekiristos infers that the hiring of an additional person or people to assist him, or that he be returned to the day shift (which was the position in which he complained of neck and back pain upon return to work in full duty capacity [Pl's dep., 188:2–4]) would have been a satisfactory reasonable accommodation, "under the ADA, reassignment is appropriate when no accommodation would enable the plaintiff to remain in his current position, he is qualified (with or without reasonable accommodation) for another position, and that position is vacant within a reasonable time." *Haysman,* 893 F.Supp. at 1104.

The hotel had no duty to reassign Kalekiristos. The plaintiff was able to perform the essential functions, but elected not to perform the essential functions to his employer's satisfaction. Moreover, Kalekiristos has not established that he requested a transfer to another position, that another position was available, and that he was qualified for another position. Although Kalekiristos did protest the transfer, he has not established that returning him to a position that required stocking six linen closets in addition to a series of other duties, including lifting 300 pounds of laundry into a washer and dryer would be a reasonable accommodation. In fact, immediately upon his return to the hotel in December 1993, and before the transfer to the evening shift, Kalekiristos complained of pain while performing the duties of the Laundry Attendant position.[17]

▇▇▇ With regard to the inference that the defendant could have made the PM Linen Runner position a more-than-one-person position, Kalekiristos has not shown that more than one employee held the position in the past, nor that it has been held by more than one person since his departure. "The ADA specifically does not require an employer to reallocate essential functions." *Haysman,* 893 F.Supp. at 1102 (citing 29 C.F.R.App. § 1630.2(o)).

The undisputed evidence is that if the linen runner does not complete the stocking, then the morning shift cannot effectively or efficiently perform its duties. In an effort to accommodate Kalekiristos' complaints of pain while at the same time ensuring that the morning shift could function properly, the defendant created an additional, non-time-

---

**17.** With regard to plaintiff's assertion that the was suddenly given the job of three people, [Pl's amend. compl., § VIII, ¶ 1], the plaintiff admitted, both prior to filing this lawsuit and since, that the transfer upon his return from medical leave was not to a position formerly held by three individuals. First, Plaintiff did not object to number 4 of the defendant's statement of material facts not in dispute, which reads:

Plaintiff was one of three Laundry Attendants on the day shift. Normally, when the Laundry Attendants stocked linen closets, each would be directed to stock the linen closets on two or three guest floors. None of the Laundry Attendants on the day shift was required to stock all eighteen linen closets ... when he stocked linen closets on the day shift, Plaintiff was responsible for the eighth, ninth and tenth floors ...

Additionally, during his deposition for the workers' compensation hearing that preceded the instant claim, speaking with the aid of an interpreter, Kalekiristos admitted he was responsible for only three floors on the day shift. [Pl's workers' comp. dep., 13:3 –15:23].

consuming essential function: a brief, accurate note of shortages. Kalekiristos' evidence demonstrated both his ability to and his refusal to complete this job function. Thus, he did not satisfactorily perform his job, thereby justifying the hotel's decision to terminate him.

### 3. Third Element:

### Despite His Qualifications and Performance, the Plaintiff Was Dismissed

Kalekiristos failed to demonstrate that he was a "qualified individual with a disability" who performed his job satisfactorily. He concedes he did not leave a note indicating which of the closets was short of linen, thus he failed to present evidence that despite satisfactory performance of all essential duties he was discharged.

### 4. Fourth Element:

■ The Plaintiff Was Replaced by Someone Outside the Protected Class Not only has the plaintiff failed to prove that he is a member of the protected ADA class, that he performed the essential functions of the job to his employer's satisfaction, and that despite his good performance he was discharged, he has also failed to prove that his replacement fell outside the protected class. In fact, the plaintiff repeatedly states he does not know who replaced him. As noted on pages 650–51 *supra*, the plaintiff also suggested the names two people as his replacements, but he made no assertions regarding these persons abilities or disabilities. Needless to say, the plaintiff has failed to establish the fourth element of the prima facie case.

### 5. Pretext:

### Defendant's Asserted Legitimate, Non–Discriminatory Reason for Discharge

Having neither presented direct evidence of disability discrimination nor evidence sufficient to enable a fact finder to infer disability discrimination, Kalekiristos has failed to shift to the defendant the burden of producing evidence of a legitimate, non-discriminatory reason for terminating the plaintiff's

termination. Nevertheless, the defendant did produce such evidence; viz. inadequate job performance. Kalekiristos, in response, provided no evidence "that the [proffered] reason was false, and that discrimination was the real reason." *St. Mary's,* 509 U.S. at 515, 113 S.Ct. at 2752.

Mr. Kalekiristos having completely failed to make out a prima facie case of disability discrimination under Title I of the ADA, the hotel employer is entitled to summary judgment as a matter of law.

### C. Title VII of the Civil Rights Act of 1964

Mr. Kalekiristos, who is black and whose national origin is Ethiopian [Pl's amend. compl. at 3, § III], alleges that "[u]pon [his] return to work at the Stouffer Mayflower Hotel as a laundry attendant in December 1993, [the hotel] singled [him] out for disparate treatment based on race and national origin and forced him to do the work normally assigned to three people, i.e., stock ten hotel floors linen closets with towels, linen, etc. Previously, [he] was assigned to stock only three (3) floors. [Upon his return from sick leave, he] was forced to transfer from day to evening shift to perform his new job duties." [Pl's amend. compl. at 3–4, § VIII, ¶ 1]. He also alleges that the hotel, "with knowledge ... that he was not proficient in the written or oral English language because of his national origin, implemented a system of communication based on the English language allegedly designed to accommodate plaintiff's physical disability." [*Id.,* ¶ 3]. Last, he charges that "[o]nce plaintiff had established a pattern of not being able to perform job related duties because of his physical disability and national origin, defendant engaged in a patter [sic] of conduct designed to harass, intimidate, and insult, plaintiff and otherwise create a hostile environment at the work place for him". [*Id.* at 4–5, ¶ 4], and that the "defendant has engaged in a systematic practice of terminating blacks and people who are nationals of countries on the continent of Africa and replacing them with White, Hispanic, and Vietnamese people." [*Id.* at 5, ¶ 8].

The hotel has moved for summary judgment on the racial and national origin dis-

crimination counts, arguing that Kalekiristos has failed to make a prima facie case of either form of discrimination and, further, assuming arguendo that the plaintiff made the prima facie case, the plaintiff has nevertheless failed to rebut the defendant's proffered legitimate, non-discriminatory reason for the plaintiff's discharge: deficient job performance. [Def's pts & auth. at 21–30].

### 1. Direct Evidence

■ As discussed in the context of the ADA, in both racial and national origin discrimination suits pursuant to Title VII, the plaintiff may prove his claim with direct evidence, and absent direct evidence, he may indirectly prove discrimination by establishing a prima facie case under the burden-shifting framework established in *McDonnell Douglas.* Although there is no precise definition of direct evidence, it is clear that "direct evidence does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decision makers unrelated to the decisional process itself." *Ayala–Gerena,* 95 F.3d at 96 (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 251–252, 109 S.Ct. 1775, 1791–92, 104 L.Ed.2d 268 (1989)(plurality opinion); Id. at 277–278, 109 S.Ct. at 1804–05 (O'Connor, J., concurring); and *Smith v. F.W. Morse & Co., Inc.,* 76 F.3d 413, 433 (1st Cir.1996)(concurring opinion)). Although probative of discrimination, there must be a nexus between the stray remark and the adverse employment decision. *Ayala–Gerena,* 95 F.3d at 96–97.

■ Plaintiff asserts that his Union Shop Steward, Ms. Maye, made a derogatory comment about Ethiopians on one occasion. [Pl's dep. 253:5–22]. As the defendant points out, "[a]t one point in his deposition, Plaintiff stated that Ms. Maye made derogatory statements about Ethiopians on three or four occasions" [pl's dep., 36:21–37:11]; however, Kalekiristos subsequently testified that this happened on only one occasion in 1993, prior to the alleged period of discrimination.[18] [Pl's dep., 253:5–22; def's pts & auth. at 29,

n. 9]. The defendant also points out that plaintiff named several Ethiopian employees that he contends the Mayflower terminated, yet plaintiff failed to offer a reason that would suggest race or national origin was the reason for their discharge. [Def's pts & auth. at 29 (referencing pl's dep., 168:9—169:1) ].

The Court finds that the single remark by Ms. Maye, albeit insensitive, is insubstantial to establish direct evidence of racial or national origin discrimination on the part of the defendant hotel. *See Ayala–Gerena,* 95 F.3d at 97 (noting "temporal proximity" of the remark to adverse employment decision is a factor to be considered). The plaintiff suggests other people insulted him, but provides nothing other than vague, global accusations, which are insufficient as direct evidence of employment discrimination. Vague, conclusory statements are not sufficient to create a genuine issue of material fact. *See McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir.1990); *see also Gagne v. Northwestern Nat. Ins. Co.,* 881 F.2d 309, 314 (6th Cir.1989)("isolated and ambiguous statements" insufficient to create a genuine issue of material fact).

Contrary to the plaintiff's argument, *Carter v. Duncan–Huggins, Ltd.,* 727 F.2d 1225 (D.C.Cir.1984) does not stand for the proposition "that an isolated joke or slur told by an employee for the defendant in a managerial capacity, is evidence of race or nationality discrimination". [Pl's opp. at 10]. Quite the contrary, *Carter* states "a single isolated racial joke, unattended by any indicia of discriminatory animus, may not be sufficient in itself to establish a violation." *Carter,* 727 F.2d at 1236. In *Carter,* "the single racial joke was presented to the jury together with numerous other pieces of circumstantial evidence"; in the instant action, the allegations of this stray national origin slur is not presented by the plaintiff with other direct or circumstantial evidence of race or national origin discrimination.

---

18. The plaintiff, in his opposition, states that Mr. Mokonnen was present when Ms. Maye allegedly made the single derogatory comment. [Pl's opp. at 9]. Mr. Mokonnen's employment ended in May 1993. [Mokonnen affidavit, pl's opp., exh. 12]. The period of alleged discrimination is December 1993 through March 1994. [EEOC compl., def's mot., exh. L].

Mr. Kalekiristos failed to establish the necessary link between Ms. Maye's single derogatory statement and the decision made by Ms. Swim and Ms. Schmuckler to terminate his employment. Such a conclusion is reinforced by plaintiff's repeated statement that he was not told why he was being dismissed [Pl's workers' comp. dep., 72:2–4; 72:21–23; exh. 1 at 4 to pl's workers' comp. dep.], and that he did not learn of the alleged discriminatory practices until after he was terminated. [EEOC compl., def's mot., exh. L]. Stray workplace remarks, without a clearly demonstrated nexus to the adverse employment action at issue, are not alone sufficient to withstand a motion for summary judgment.

■ With regard to the other Ethiopians the plaintiff names to establish circumstantial evidence of a pattern and practice of discrimination on the part the defendant hotel, the plaintiff "was unable to give one reason that would suggest national origin (or race) was the reason for these persons' discharge." [Def's pts & auth. at 29]. Rather, the plaintiff only assumes their discharge was based on discrimination because he can think of no other reason:

Question: "What makes you think—You say these people were discharged. What makes you think they were discharged because of their race?"

Pl's Attorney: "Objection as to form. You may answer."

Witness: "I can't really give you an answer."

Question: "Is there any fact that you can point to or is it a feeling that you have?"

Witness: "I can't really tell you."

Question: "Is that because you don't want to tell me or there's nothing additional specific that you can point to?"

Pl's Attorney: "Objection as to form. You can answer."

Witness: "Whatever I have told you before is what I have said and I cannot add any more."

[Pl's dep., 166:2–19]. This discussion of the other persons allegedly discharged for discriminatory reasons begins on page 143 of the deposition testimony. The Court was provided with pages 142 –150, 158—164, 166, 168–169, and 172. The discussion began with the above-noted question posed to the plaintiff:

Question: "In paragraph eight, you state that defendant is engaged in a systematic practice of terminating blacks. What facts do you have to support that?"

Witness: "About five or six Ethiopians that were fired."

[Pl's dep., 143:5–9] The plaintiff then identified the people to whom he was referring—a woman by the first name of Genet, a person by the first name of Nega, a gentleman named Gizaw Bishir, and gentleman named Hailedingle [Mokonnen], a woman by the first name of Lielt, and a Jamaican man by the first name of William. [Pl's dep., 143:10—147:16]. When asked who was replaced by a white person, a Hispanic and a Vietnamese, the plaintiff responded:

Initially, when I was working in the laundry department, a lot of the—in the hotel, in the laundry department there was no white or Hispanic people there. I am stating, the whole hotel—in the housekeeping department, a lot of the blacks, after Mr. Schaefer and the other lady that was here, became managers, I saw that a lot of the blacks were being replaced either by Vietnamese or Hispanic employees.

[Pl's dep., 147:20–148:6]. He went on to state that Messrs. Bishir and Hailedingle were replaced by Vietnamese, and the others by Hispanics. [Pl's dep., 148:7–20]. And, as noted on page 15 *supra*, when asked who replaced him, the plaintiff stated, "I don't know since I was not there. I have never been back. I don't know what is being done." [Pl's dep., 148:21—149:1]. Mr. Kalekiristos was questioned again about "other facts that [he] rel[ied] on to support the allegation that blacks who are nationals of the countries of the African Continent were replaced—that there was a systematic plan of firing them or replacing them with white, Vietnamese and Hispanic employees". [Pl's dep., 149:2–9]. He responded, "It is just a fact that I have told you. And I am a victim of that." [Pl's dep., 149:12–13]. On page 158 of the plaintiff's deposition, this line of questioning continued:

*Question:* "What is the basis for that statement? What makes you think that the Mayflower has a systematic program for terminating blacks and people from countries on the African continent?"

*Witness:* "The fact that I base this is that the hotel has terminated people, like me, Ethiopians and other Africans, and have replaced them with Vietnamese and Hispanic workers. And this record can be found in the hotel management office, especially the lady that was here last time [Renate Seybold, Director of Housekeeping,] is the one who does these kinds of things.

[Pl's dep., 158:7–19]. The plaintiff then named other Ethiopians who he alleges were discriminatorily discharged–Tesfay Brehe and Kahsu Woldai, and provided Nega's last name, Gebru. [Pl's dep., 158:20–163:21]. The plaintiff, when asked "[w]hat makes [him] think that these people's national origin had anything to do with their being discharged", responded:

*Witness:* "I can't really say."

Question: "Does that mean that [the plaintiff] doesn't have anything else to tell me at this point?"

*Witness:* "Let them come and testify for it. You can ask the individual."

*Question:* "Right now I'm just testing his knowledge."

*Witness:* "My knowledge is that they were replaced by Hispanics."

Question: "And it's that knowledge that is the basis for the statements they were terminated because of their national origin?"

*Witness:* "Just like they threw me out like trash, they face the same situation."

Question: "Are there any other facts that makes them believe they were terminated, these individuals were terminated because of their national origin?"

Witness: "There is nothing I can add for now. But if you want further information, you can talk to them."

Question: "Why does he think that they Mayflower had a systematic practice of discharging blacks and natives of the African countries?"

*Pl's Attorney:* "Objection as to form. You can answer."

*Witness:* "I was terminated and most people who are terminated, what more system do you need more than this."

[Pl's dep., 168:10—169:19]. On the final page of deposition testimony from this line of questioning provided for the Court, the plaintiff states:

*Witness:* "While I was working there, I observed some of my colleagues being terminated and being replaced by Hispanics and Vietnamese. And also I was terminated and replaced similarly."

*Question:* "Who replaced you?"

*Witness:* "I don't really know but I assume that's what happened."

*Question:* "Do you know the race or nationality of the person that replaced you?"

*Witness:* "I have never gone back to the hotel after I was terminated so I don't know."

[Pl's dep., 172:1–11]. Clearly, the plaintiff's allegations are just that, allegations, based on no direct or circumstantial evidence from which a reasonable jury could infer discrimination. In his opposition, Kalekiristos submitted a sworn affidavit by Mr. Mokonnen, whose employment at the defendant hotel ended in May 1993—seven months prior to the period of alleged discrimination, who states he heard Ms. Maye make a disparaging remark about Ethiopians, but he does not allege any form of discrimination. As discussed with regard to direct evidence, allegations of one remark does not make a case of discriminatory discharge.

### 2. Indirect Evidence: *McDonnell Douglas* Burden Shifting

Since the plaintiff has presented no direct evidence of national origin or race discrimination, the Court turns to the *McDonnell Douglas* framework, under which the plaintiff must first make a prima facie showing of discrimination, which is done by establishing (1) that plaintiff is a member of a protected class; (2) that plaintiff performed his or her job satisfactorily; (3) that plaintiff was discharged; and (4) that plaintiff was replaced by someone of the same qualifications but

outside the plaintiff's protected class. *Id.*, 411 U.S. at 802, 93 S.Ct. at 1824; *St. Mary's*, 509 U.S. at 506, 113 S.Ct. at 2746–47.

As with disability discrimination, if a plaintiff establishes a prima facie case, a rebuttable presumption of discrimination shifts the burden of production to the defendant to provide a legitimate, non-discriminatory explanation for the adverse employment decision. *St. Mary's*, 509 U.S. at 506, 113 S.Ct. at 2746–47. If the defendant offers a legitimate, non-discriminatory explanation, the burden of production shifts back to the plaintiff to demonstrate that the defendant's reason is a pretext for discrimination and that a discriminatory animus motivated the termination. *St. Mary's*, 509 U.S. at 507 & 515, 113 S.Ct. at 2747 & 2751–52.

Not only has Kalekiristos failed to establish a prima facie case of race and/or national origin discrimination, the plaintiff has failed to adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, and to show that the adverse employment action was motivated by intentional race or national origin discrimination.

### a. First Element: Membership in Protected Class

Although it is well-established that blacks make up a protected race class pursuant to Title VII, it is less clear what comprises a protected class for national origin discrimination, and courts have noted the legislative history concerning the meaning of national origin provides little guidance. The Supreme Court, in *Espinoza v. Farah Mfg. Co., Inc.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), noted, "[t]he term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Id.* at 88, 94 S.Ct. at 336.

The plaintiff blurs the lines of distinction between national origin and race discrimination in his allegation that the defendant hotel "engaged in a systematic practice of terminating blacks and people who are nationals of countries on the continent of Africa and replacing them with White, Hispanic and Vietnamese people." [19] The parties are not disputing, however, whether the plaintiff belongs to a protected class for both race and national origin pursuant to Title VII, so the two can be analyzed together.

### b. Second and Third Elements: Dismissal Despite Satisfactory Job Performance

As noted in the discussion on disability discrimination, to make out a prima facie case of both race and national origin discrimination the plaintiff must show he was qualified for the position and that he performed his duties to his employer's satisfaction, but was nevertheless terminated. As detailed at length above, Kalekiristos was qualified for the P.M. Linen Runner position; however, he has not established that he performed the essential functions of linen runner to his employer's satisfaction. [*See* pages 660–64 *supra*].

### c. Fourth Element: Replacement Has Similar Qualifications But Is Outside Protected Class

A discrimination plaintiffs final showing in order to establish a prima facie case is that he or she was replaced by someone with similar qualifications but who falls outside the protected class. Mr. Kalekiristos was permanently replaced in the position of PM Linen Runner by a black male who emigrated to the United States from Sierra Leon, a country on the continent of Africa. Clearly, Kalekiristos' replacement fell into each of the protected classes–black and African.

Also noted at 650–51 *supra*, Kalekiristos disputes who temporarily replaced him; at one point he contends he was replaced by Mr. Henry, and at another point that Mr. James replaced him, and ultimately he con-

---

**19.** Although the plaintiff identified himself as a Turk in his workers' compensation deposition taken prior to the filing of this lawsuit, for the purposes of summary judgment analysis, the Court is relying solely on his assertions in his amended complaint in which the plaintiff identified himself as black. Also, in his amended complaint, the plaintiff enlarged the scope of national origin discrimination to the continent of Africa, rather than the narrower scope of the country of Ethiopia. [Pl's workers' comp. dep., 27:1; pl's amend. compl. at 2, § III; *id.* at 5, § VIII, ¶ 8.].

cedes that he doesn't know who replaced him. The defendant concedes that Henry, who was already employed by the Mayflower, and who is black and thus falls within the protected racial class, temporarily replaced the plaintiff. The plaintiff, however, makes no assertions whatsoever as to Henry's national origin. Thus, looking at the evidence in a light most favorable to the plaintiff and finding that Henry replaced him, Kalekiristos still fails to make out a prima facie case of discrimination on the basis of either race or national origin.

In sum, Kalekiristos, having failed to establish that he performed the essential functions of his job adequately and that he was replaced by someone outside his protected class, clearly failed to produce evidence as to the second, third and fourth elements of a prima facie case of racial and national origin discrimination.

#### d. Pretext Argument:

### Defendant's Proffered Legitimate, Non–Discriminatory Reason for Discharge

█ Assuming arguendo that the plaintiff had established a prima facie case, the defendant argues that Kalekiristos has not submitted evidence to rebut the legitimate, non-discriminatory reasons proffered for the plaintiff's discharge–deficient job performance.

First, Kalekiristos argues that the defendant had knowledge of his English language deficiencies, thus the writing requirement that advises his supervisors of the shortages in the linen closets was simply a pretext for national origin discrimination. However, as discussed at 661 *supra*, Kalekiristos testified at both the 1995 workers' compensation deposition and in the deposition related to the instant action that he communicated well enough in English to complete his duties at the Mayflower. Kalekiristos also demonstrated that he could write the shortage lists [*see* def's mot., exh. 8 to exh. C]; in his own handwriting, he acknowledged on his Diplomat Parking employment application that he was fluent in English [*see* def's mot., exh. 3 to exh. A]; and the plaintiff confirmed in his deposition testimony that he communicated

well enough to be considered, in his mind, fluent. [*See* pl's dep., 112:4–20]. He, therefore, cannot in the 11th hour, faced with a properly supported motion for summary judgment, generate a sworn affidavit [*see* Pl's 12/19/96 affidavit, pl's opp., exh. 1 ] to contradict his own prior sworn testimony in order to create a genuine issue of material fact. *See Gagne*, 881 F.2d at 315 (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986)("It is accepted precedent that 'a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts his earlier deposition testimony.'"))

Kalekiristos also alleges that the transfer to the linen runner position was pretextual conduct because the defendant hotel was well aware of his back and neck injury. Although he argues that the excuse for the transfer was pretextual because the defendant did not contract out the laundry service until March 1994, he has not submitted any evidence to the contrary. Indeed, although the letter to the employees about the out-sourcing of the laundry was not issued until March 14, the plaintiff's own testimony established that is was common knowledge within the laundry department about the contract and imminent reassignments. [Pl's dep., 200:2–7]. Moreover, 18 other employees, 13 of whom were higher in seniority than he, were all displaced by the contract. Thus the defendant's action implicated many employees and therefore cannot be viewed as action taken solely against Kalekiristos.

As with the ADA claim, in Title VII discrimination cases, the plaintiff at all times bears the ultimate burden of establishing that he has been the victim of illegal discrimination. *See St. Mary's*, 509 U.S. at 506–11, 113 S.Ct. at 2746–50. This, Kalekiristos has failed to do.

#### 3. Disparate Treatment Model

█ Kalekiristos also argues that he was the object of disparate treatment. However, he has failed to show any disparate treatment. Although he alleges, he has not shown that because of his race and national origin he has been singled out and treated less favorably than others similarly situated. *See Int'l Brotherhood of Teamsters v. United*

*States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

He has presented no evidence of similarly situated persons receiving more favorable treatment. Nor has he presented evidence of differences in treatment. Kalekiristos has failed to dispute that his replacement, Mannah, was also required to stock all 18 linen closets and to leave an accurate note of shortages if he failed to complete the linen run during the eight hour shift. [*See* Mannah affidavit, defis, exh. J]. He has failed to show that he was singled out for not wearing his lift belt. Last, as explained in detail at 45–48 *supra,* he has failed to establish a laundry department-, or hotel-wide pattern and practice of discrimination. Kalekiristos, therefore, has failed to create a genuine issue of material fact with regard to disparate treatment based on race and national origin.

### IV. Conclusion

Upon consideration of the defendant's motion for summary judgment, the opposition, reply, the entire record, and the applicable law and for the reasons stated, the defendant's motion for summary judgment is granted and the complaint dismissed.